# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53464-9-II |
| Respondent, | |
| v. | |
| MEHMET BILGI, | PUBLISHED IN PART OPINION |
| Appellant. | |

CRUSER, J.—Mehmet Bilgi was convicted of attempted rape of a child in the second degree and communication with a minor for immoral purposes. Bilgi appeals his convictions, arguing that (1) the trial court erred when it denied his motion to suppress text messages and e-mails obtained while law enforcement was violating Washington's privacy act, chapter 9.73 RCW, (2) the trial court erred when it denied his motions to compel discovery related to the technology used by law enforcement, and (3) the prosecuting attorney committed misconduct in closing argument.

In the published portion of this opinion, we hold that (1) the trial court did not err when it denied Bilgi's motion to suppress because law enforcement did not intercept Bilgi's text messages or e-mails in violation of the privacy act. In the unpublished portion of this opinion, we hold that (2) the trial court did not abuse its discretion when it denied Bilgi's motions to compel discovery and that (3) the prosecuting attorney did not commit reversible misconduct. Therefore, we affirm Bilgi's convictions.

FACTS

I. FACTS UNDERLYING THE CHARGES

Detective Kristl Pohl, working with Washington State Patrol's (WSP) Missing and Exploited Children's Task Force (MECTF), posted an advertisement on Doublelist, a website similar to Craigslist where people advertise for sexual encounters, as part of MECTF's thirteenth "Net Nanny" operation.[1] 9 Verbatim Report of Proceedings (VRP) at 905. The advertisement asked, "where is the hook up spots in Puyallup that a yung [sic] hot guy could go?" Clerk's Papers (CP) at 156. It included a picture of a young adult male with a Snapchat filter that made his face resemble a "koala bear." 11 VRP at 1190. When Pohl answered messages directed to this advertisement, she assumed the persona of a 13-year-old boy named "Jake." 9 VRP at 934.[2]

Bilgi responded to Pohl's advertisement with an e-mail message that said, "hey did you find your guy or spot yet ? hit me up and we can have some fun together." Ex. 2 at 1. He attached a picture of an erect penis. Bilgi soon mentioned the possibility of meeting people at "neighborhood dive bars," to which Jake responded that he was not old enough to go to bars. *Id.*

---

[1] Detective Sergeant Carlos Rodriguez, the supervisor of MECTF, defined the Net Nanny operation as "a proactive undercover operation . . . looking for people who are offering children for sex, or any type of exploitation, or people seeking to have sex with kids, or sexually exploited children." 9 VRP at 835.

[2] Pohl did not ever use a name to identify herself when messaging Bilgi, but the State refers to the fictitious child as "Jake" throughout the proceedings.

When Bilgi asked how old Jake was, Pohl said, "13." *Id.* at 3. After initially expressing surprise, Bilgi responded, "so what do you wanna [sic] do?" *Id.*[3]

After about a week of sending e-mail messages, Bilgi and Pohl switched to communicating through text messages. Bilgi texted using Google Voice, "a voiceover internet number" that was not connected to his cellular phone. 9 VRP at 931. He told Jake that he was 27 years old.[4] Bilgi and Jake communicated periodically over the next month, with most of their conversations involving sexual content. Eventually, Bilgi arranged to meet Jake at a park.

Prior to arriving at the park, Bilgi texted a picture of his face and a description of his car. When Bilgi arrived, Pohl texted, "can you roll down ur [sic] windows and wave?" CP at 318. Officers arrested Bilgi after they saw him roll down his window and wave. Officers later recovered condoms and personal lubricant from Bilgi's car.

The State charged Bilgi with attempted rape of a child in the second degree and communication with a minor for immoral purposes.

## II. PROCEDURAL HISTORY

MOTIONS TO SUPPRESS COMMUNICATIONS

During an interview with defense counsel, Detective Pohl disclosed that she used a software named Callyo to send text messages to Bilgi from her computer. Pohl explained that Callyo allows MECTF to sort messages by the phone number they are using and by the suspects'

---

[3] Pohl inadvertently responded to Bilgi using the e-mail address mamaKK360@gmail.com, an address that she typically uses when adopting the persona of a mother, not a teenage boy. However, Bilgi did not "express any concern" about the e-mail name. 9 VRP at 920.

[4] Bilgi was actually 35 years old.

phone numbers. It also allows the detectives to download all of the messages associated with a particular suspect's phone number in a zip file and to open those messages in a spreadsheet.

After this interview, Bilgi moved to suppress "all evidence relating to the e[-]mail and text communications of the defendant, including oral testimony about them," under the privacy act. *Id.* at 488. Bilgi argued that his text messages were unlawfully "intercepted and recorded by law enforcement using specialized computer surveillance software called 'Callyo.' " *Id.* at 490. The State responded, "The messages were not intercepted at all. They were sent by the defendant to a boy he knew as 'Jake' at a specific phone number. They were received by 'Jake' at that same number. They were opened and read by 'Jake.' " Supp. CP at 1240.

At the CrR 3.6 hearing, Detective Sergeant Rodriguez testified that he controls the Callyo account for the Net Nanny operations. He explained that Callyo, like Google Hangouts, generates phone numbers for the officers to use to communicate with suspects, but Callyo is a preferable program because to document communications with Google Hangouts, the officers "would have to take screen shots . . . as [they] scrolled through [their] computer screen . . . and it was very tedious." 4 VRP (May 21, 2019) at 233. With Callyo, they can download the entire conversation by clicking a button.

When he first set up the Callyo account, Rodriguez assigned separate usernames to individuals working on the operation, but now he uses one login and password for the entire operation because multiple logins "just isn't efficient." *Id.* at 270. Now, if one of the other officers asks Rodriguez to review their chats, he "can either just move over to their seat and look, or [he] can do it right from [his] computer." *Id.* at 255. The shared login also makes it easier for the officers to take over for one another. Multiple people can be logged in under the same username at the

4

same time, and anybody who logs in has the ability to access and participate in any of the chats. Rodriguez testified that members of MECTF have "the explicit authority" to read messages sent through Callyo. *Id.* at 268.

Pohl similarly testified that although she was the only person who messaged Bilgi, "anybody that has the log in and the password to the account could view it." *Id.* at 313. She testified that she sent all of her text messages to Bilgi through the Callyo program, and that even if it was not specifically discussed, other members of the operation had her permission to access those messages.

On the day of Bilgi's arrest, Detective John Garden was performing surveillance. Garden testified that he was logged in to Callyo on his iPad, observing the communications between Pohl and Bilgi as they were occurring. Detective Kathryn Chovil-Peterson, who also performed surveillance for Bilgi's arrest, testified that she was "capable of" accessing the chats while she was waiting for Bilgi to arrive at the arrest location, but she "[did not] recall . . . in Mr. Bilgi's case if [she] was monitoring the conversations or not." *Id.* at 301-02. Pohl was also logged in to Callyo at headquarters, and "[s]omebody in the room would have been acting as the incident commander and would have been the one responsible for passing that information onto the surveillance units." *Id.* at 319.

Bilgi contended that Garden's admitted viewing of the messages while he was performing surveillance constituted a privacy act violation because Garden was not a party to the conversation and he did not have court authorization to view the messages in real time. Bilgi argued, "It is not reasonable for a sender of a communication to expect that that private communication will go to a surveillance software . . . where it will be stored and then transmitted to multiple people . . . in

different locations, and who are not participating in the conversation in any way." *Id.* at 256-57. The State responded that "once law enforcement lawfully possesses the information, that's the end of the inquiry. . . . It's delivered to one account, which is accessible by law enforcement as a whole because Carlos Rodriguez gave them the authority to do it." *Id.* at 367-68.

At the conclusion of the hearing, the trial court found that the communications between Bilgi and Pohl were private and that they were recorded on Pohl's computer, which is an electronic device. It also found that Bilgi impliedly consented to the recording of his communications on Pohl's device.

The trial court noted that MECTF used a software that "allowed officers to communicate with multiple subjects at the same time, using the same undercover telephone number for outgoing messages, and then generate a report containing all the messages from a single incoming number," but it found that Bilgi's "consent is not based in any way on the nature of the software used by the recipient." CP at 1202. It further found that both Rodriguez and Pohl consented to other members of the Net Nanny operation reading their text messages.

The trial court rejected Bilgi's argument that his "consent was limited to the intended recipient, 'Jake' (Det. Pohl), such that any other officer who read his messages 'intercepted' them." *Id.* at 1203. "It is well-settled in this state that the sender of a text message runs the risk the recipient will share the content of that message with one or multiple other persons." *Id.* Therefore, "Det. Pohl did not violate the Privacy Act by allowing other members of MECTF to read her communications with [Bilgi]." *Id.* at 1204. The trial court denied Bilgi's motion to suppress his communications.

At trial, the State admitted Bilgi's text messages to Jake. The jury found him guilty as charged. Bilgi appeals his convictions.

ANALYSIS

WASHINGTON'S PRIVACY ACT

Bilgi argues the trial court erred when it denied his motion to suppress because various members of MECTF intercepted his communications in violation of the privacy act. Bilgi concedes that he impliedly consented to the recording of his messages on Detective Pohl's device, but he contends that MECTF used Callyo to "intercept[ his communications] and broadcast them, allowing anyone logged into the program to observe the communications as they occurred," and that he did not consent to such an interception. Br. of Appellant at 25. Bilgi specifically challenges the trial court's legal conclusion that his implied consent to record the messages was not limited to Jake's, or Pohl's, device, as well as the court's legal conclusion that Pohl could allow other members of the operation to read the messages without violating the privacy act.[5]

We hold that law enforcement did not intercept Bilgi's text messages in violation of the privacy act because Bilgi intended to send messages to a fictitious child, and his messages were received by the account behind that fictitious child.

---

[5] Bilgi actually assigns error to the trial court's findings of fact XI and XII, but as he correctly notes, these findings were conclusions of law "and we treat [them] as such." *State v. Norris*, 157 Wn. App. 50, 66, 236 P.3d 225 (2010).

A.     LEGAL PRINCIPLES

Under Washington's privacy act, communications may be intercepted or recorded only if all parties consent or if law enforcement receives specific court authorization. RCW 9.73.030.[6] It is unlawful "to intercept, or record any . . . [p]rivate communication . . . by any device electronic or otherwise designed to record and/or transmit said communication . . . without first obtaining the consent of all the participants in the communication." RCW 9.73.030(1)(a). The act includes exceptions for emergencies, threats, and the investigation of specific crimes, but those exceptions do not apply here. *See* RCW 9.73.030(2), .210, .230.

Information obtained in violation of RCW 9.73.030 is inadmissible in a criminal trial. RCW 9.73.050. This exclusionary rule broadly encompasses "any information obtained while using unauthorized electronic broadcasts, including visual observations and assertive conduct." *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990); *see also State v. Gearhard*, 13 Wn. App. 2d 554, 560, 465 P.3d 336 (explaining that if a recording does not fall within an exception to the privacy act, "neither the recording nor any testimony about the recorded conversation [is] admissible evidence"), *review denied*, 196 Wn.2d 1015 (2020). Further, if information obtained in violation of the privacy act was used in an application for a search warrant, and the remaining evidence in support of the warrant is insufficient to support a finding of probable cause in the absence of the unlawfully obtained information, then any evidence obtained through the search warrant must also be excluded. *State v. Salinas*, 121 Wn.2d 689, 697, 853 P.2d 439 (1993). "Failure to suppress evidence obtained in violation of the act is prejudicial unless, within

---

[6] The legislature reenacted and amended this statute in 2021, but the amendment does not impact the provisions at issue in this case. *See* LAWS of 2021, ch. 329, § 21.

reasonable probability, the erroneous admission of the evidence did not materially affect the outcome of the trial." *State v. Christensen*, 153 Wn.2d 186, 200, 102 P.3d 789 (2004).

The Washington Supreme Court has identified four factors of a privacy act violation: "(1) a private communication transmitted by a device, which was (2) intercepted or recorded by use of (3) a device designed to record and/or transmit (4) without the consent of all parties to the private communication." *State v. Roden*, 179 Wn.2d 893, 899, 321 P.3d 1183 (2014). Bilgi's challenge involves the second factor: whether Bilgi's communications were intercepted.

We review alleged violations of the privacy act de novo. *State v. Racus*, 7 Wn. App. 2d 287, 297, 433 P.3d 830, *review denied*, 193 Wn.2d 1014 (2019). Unchallenged findings of fact are considered verities on appeal, and the trial court's conclusions of law must be supported by its findings of fact. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014); *State v. Glant*, 13 Wn. App. 2d 356, 364, 465 P.3d 382, *review denied*, 196 Wn.2d 1021 (2020). We review the trial court's conclusions of law de novo, and unchallenged conclusions of law become the law of the case. *Glant*, 13 Wn. App. 2d at 364; *Nguyen v. City of Seattle*, 179 Wn. App. 155, 163, 317 P.3d 518 (2014).

1.    DEFINING "INTERCEPT" UNDER THE PRIVACY ACT

RCW 9.73.030(1) makes it unlawful "to intercept, or record" private communications. In interpreting the privacy act, "[w]here there is no statutory definition to guide us, words should be given their ordinary meaning." *Roden*, 179 Wn.2d at 904.

*Merriam-Webster* defines "intercept" as (a) "to stop, seize, or interrupt in progress or course or before arrival" or (b) "to receive (a communication or signal directed elsewhere) usually secretly."    MERRIAM-WEBSTER    ONLINE    DICTIONARY,    https://www.merriam-

webster.com/dictionary/intercept (last visited Oct. 12, 2021). *Black's Law Dictionary* at 966 defines the verb "intercept" as "[t]o covertly receive or listen to (a communication)" and associates the term with "covert reception by a law-enforcement agency." (11th ed. 2019).

In *Roden*, an officer "opened, read, and responded to" text messages while the owner of the cell phone was in custody. 179 Wn.2d at 904. The supreme court found this to be "consistent with the ordinary definition of 'intercept'—to 'stop . . . before arrival . . . or interrupt the progress or course.' " *Id.* (alteration in original) (quoting *Webster's Third New International Dictionary* 1176 (2002)). Analogizing sending a text message to mailing a letter, the court reasoned that "the ordinary meaning of 'intercept' would encompass opening and reading a letter in someone else's mailbox before they receive it." *Id.* at 905. Further, the officer in *Roden* "did not merely see a message appear on the iPhone;" he "manipulated" another individual's phone to access the message. *Id.* at 906.

With the exception of *Roden*, however, Washington courts have primarily analyzed interception in the context of oral communications. In *State v. Faford*, the supreme court held that a private individual unlawfully intercepted his neighbors' communications when he used a police scanner to eavesdrop on their telephone conversations. 128 Wn.2d 476, 479, 910 P.2d 447 (1996). In *Christensen*, the parties agreed that a mother violated the privacy act when she "activated the speakerphone function of the cordless telephone system by pressing a button on the base unit" and

listened to a conversation between her daughter and her daughter's boyfriend. 153 Wn.2d at 190, 192.[7]

In *Fjermestad*, an undercover detective wore a body wire, without prior court authorization, while conducting a drug operation. 114 Wn.2d at 829-30. To ensure officer safety, this device transmitted audio of the undercover detective's communications to two other officers who were positioned nearby. *Id.* The supreme court held, "RCW 9.73 has no provisions for an undercover police operation to use electronic eavesdropping devices to transmit conversations without first obtaining court authorization, no matter how laudable the reasons." *Id.* at 836.[8]

2.    SHARING RECORDED COMMUNICATIONS

Washington courts have held that a person impliedly consents to the recording of their communications on an electronic device when they communicate through e-mail, text messaging, and some online instant messaging software. *State v. Townsend*, 147 Wn.2d 666, 675-77, 57 P.3d 255 (2002); *Glant*, 13 Wn. App. 2d at 366; *Racus*, 7 Wn. App. 2d at 300. "[A] communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded." *Townsend*, 147 Wn.2d at 675.

---

[7] Since the parties agreed that the action in *Christensen* constituted an interception under the privacy act, the court did not engage in any analysis of the term "intercept." The court commented that if the State had "argued and proved that [the mother's] act of listening in to her daughter's conversation with Christensen was not an intercept, the resolution of this case might well have proceeded down a different analytical path." *Christensen*, 153 Wn.2d at 197.

[8] The supreme court has also designated the use of a pen register as an "intercept . . . within the definition of a 'private communication transmitted by telephone.' " *State v. Gunwall*, 106 Wn.2d 54, 69, 720 P.2d 808 (1986) (quoting RCW 9.73.030(1)(a)). " 'A pen register is a mechanical device, usually installed at a central telephone company facility, that records on paper the numbers dialed from a particular telephone.' " *Id.* at 63 n.15 (quoting Clifford S. Fishman*, Pen Registers and Privacy: Risks, Expectations, and the Nullification of Congressional Intent*, 29 CATH. U. L. REV. 557, 558 n.3 (1980)). A pen register does not record the contents of any communications. *Id.*

When the sender of a written electronic message impliedly consents to the message's recording, they bear the risk that the intended recipient will share the message with others. In *Glant*, we reasoned that when a person sends e-mail or text messages, "they do so with the understanding that the messages [will] be available to the receiving party for reading or printing." 13 Wn. App. 2d at 365. In our view, it is logical to assume they do so with the additional understanding that the messages will be available to the receiving party for forwarding or sharing electronically.

In *Roden*, the intercepted communications were recorded on the recipient's phone, and the supreme court explained that "the privacy act was violated because the detective intercepted [ ] private communications *without* [*the sender's*] *or* [*the recipient's*] *consent* and without a court order." 179 Wn.2d at 906-07 (emphasis added). This conclusion suggests that the outcome could have been different if the recipient had willingly shared the recorded messages with the detective.

B.     APPLICATION

Here, the State conceded that Bilgi's communications were private, and the trial court found that Bilgi's communications were private, that they were recorded on Pohl's computer, which was a device designed to record the communications, and that Bilgi impliedly consented to this recording. Bilgi does not dispute these findings on appeal. Rather, Bilgi contends that his communications were unlawfully intercepted by Callyo prior to Pohl's receipt of the communication and that his communications were unlawfully intercepted by officers who were not the intended recipients, simultaneous to Pohl's receipt of the communication. He argues that his implied consent to the recording was not an implied consent to the interception.

As a preliminary matter, any argument that Callyo independently intercepted Bilgi's communications was not preserved for appeal. In his motion to suppress communications pursuant to RCW 9.73.050, Bilgi argued only that "[t]he State, and specifically the law enforcement officers involved in the investigation and arrest of the defendant, violated RCW 9.73.030 when *they* illegally intercepted the private e[-]mail and text conversations of the defendant." CP at 489 (emphasis added). Bilgi did not argue that Callyo unlawfully intercepted his communications. Regardless, this argument fails on the merits because Callyo is incapable of intercepting a communication in violation of the privacy act. RCW 9.73.030(1) states, "[I]t shall be unlawful for any *individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions* to intercept, or record" private communications. (Emphasis added.) Callyo is a computer software, not an actor with agency.

Bilgi makes two additional arguments. First, he argues that Pohl unlawfully intercepted his communications because she, in particular, was not his intended recipient. Second, he argues that the officers with whom Pohl shared Bilgi's communications as they were being received unlawfully intercepted his communications because even if Pohl had been his intended recipient, he did not consent to Pohl sharing his communications with others.

With respect to Bilgi's first argument, we disagree that Pohl unlawfully intercepted Bilgi's communications because she was not actually a 13-year-old boy named Jake. Bilgi willingly communicated with the person controlling the account purporting to be Jake, and thus there was no unlawful interception of his messages by the person behind the account. Bilgi's displeasure with the ruse he failed to detect does not constitute a redressable legal harm. Moreover, Bilgi offers no authority for this novel and expansive application of the privacy act. *See B. & B. Farms, Inc. v.*

*Matlock's Fruit Farms, Inc.*, 73 Wn.2d 146, 152, 437 P.2d 178 (1968) (declaring that where the petitioner fails to cite authority to support their position, "we will not presume that such authority exists").

Additionally, the viewing of the electronic communications by other officers who, like Pohl, made up the law enforcement team in control of the account posing as Jake did not constitute an unlawful interception of Bilgi's communications. The officers did not covertly receive messages that were directed elsewhere. Nor is there evidence that other officers "manipulated" Pohl's device or opened the messages before they were received by Pohl. *Roden*, 179 Wn.2d at 906. Bilgi sent messages to a fictitious child, and his messages were received by the account behind that fictitious child. When an account is held by multiple people, the account holders do not violate the privacy act by simultaneously receiving messages sent to that account. Jake's phone number, which was associated with MECTF's Callyo account, was Bilgi's intended recipient. The messages were received by the intended recipient. The fact that multiple officers were authorized to access the account does not change this conclusion.

It is commonly understood that a written communication, once sent to its intended recipient, can be passed on or shared by the recipient. *See Glant*, 13 Wn. App. 2d at 365. With the prevalence of web-based software such as e-mail accounts and Apple IDs, there is also a general recognition that usernames and passwords may be shared and that multiple people may log in to the same account at the same time. Even if the person controlling the account in this case had *actually* been a 13-year-old boy named Jake, Bilgi had no ability to restrain Jake from sharing his communications with anyone Jake so chose. Likewise, whether Pohl shared the communications she received from Bilgi with other officers as she received them, or the other officers with access

to the account were logged in and read them on their own devices as they were received, there was no violation of the privacy act.

Bilgi relies on *Faford*, *Christensen*, and *Fjermestad*, but these cases are distinguishable. Both *Faford* and *Christensen* involved unrecorded oral communications that were intercepted by a third party without the consent of either of the conversation's participants.

In *Fjermestad*, the trial court suppressed testimony about unrecorded oral communications that were intercepted, and the defendant was convicted based only on a detective's simultaneous visual observations. 114 Wn.2d at 829-30. Therefore, the question on appeal was limited to the scope of the privacy act's exclusionary rule. *See id.* at 834-35. The supreme court did not consider whether the defendant could have impliedly consented to others hearing his communications. If it had, the analysis would have focused on the defendant's expectations of privacy in his in-person oral communications—a situation that is not comparable to the one presented here. "Generally, two people in a conversation hold a reasonable belief that one of them is not recording the conversation." *State v. Kipp*, 179 Wn.2d 718, 732, 317 P.3d 1029 (2014). In contrast, when a written communication is recorded by a recipient's device, there is a general understanding that the recipient could share it.

## CONCLUSION

We hold that MECTF did not intercept Bilgi's communications in violation of the privacy act when it used a single, shared account for its Net Nanny operation. It is not legally significant that the account was created using Callyo. Therefore, the trial court properly denied Bilgi's motion to suppress all evidence relating to his communications. We affirm Bilgi's convictions.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bilgi appeals his convictions for attempted second degree rape of a child and communication with a child for immoral purposes, arguing that the trial court abused its discretion when it denied his motions to compel discovery relating to Callyo and that the prosecutor committed reversible misconduct during closing argument. We hold that the trial court did not abuse its discretion, and none of the prosecuting attorney's arguments warrant reversal.

ADDITIONAL FACTS

I. PRETRIAL MOTIONS

A.    DISCOVERY MOTIONS

1.    MOTION TO COMPEL DISCOVERY

After learning that MECTF used a software called Callyo to text with suspects, Bilgi filed a motion to compel discovery related to Callyo. The motion requested that the trial court order WSP to provide a copy of the Callyo program or, in the alternative, to provide defense counsel and a defense expert "meaningful access" to the program. CP at 99. Bilgi asserted that "[t]he reports generated by this application [were] the cornerstone of the State's case against [him]." *Id.* at 101. Bilgi further asserted that defense counsel was unable to purchase Callyo herself because she was not law enforcement and the prosecuting attorney "declined to provide assistance" in facilitating

access to the program. *Id.* at 102. Bilgi argued that he was entitled to investigate the Callyo program to (1) ensure its reliability and (2) develop a record for a privacy act claim.[9]

Bilgi retained a computer forensics expert to investigate the software. Defense counsel then represented to the trial court that, based on an initial review of 20 patent applications, Callyo appeared to be "significantly more complicated and significantly more important to the case than we previously could have recognized." 5 VRP (Mar. 14, 2019) at 64. These patents illustrated "a non-exhaustive set of *possible* embodiments of the technology," such as monitoring communications in real time, recording phone calls, accessing personal information connected to a phone number, configuring a device into a "mobile bug," and geolocating a suspect. CP at 114, 118 (emphasis added). Later interviews with law enforcement, however, showed only that MECTF used Callyo to send and download text messages, and to occasionally view one another's communications.[10]

2.     SUPPLEMENTAL DISCOVERY DEMAND & AMENDED MOTION TO COMPEL

Bilgi later filed a supplemental discovery demand, demanding Callyo user guides, manuals, and training materials; confidentiality agreements between the State or law enforcement and Callyo's vendor; marketing materials; and "information concerning when the prosecuting attorney became aware of the use of Callyo." *Id.* at 105. He then filed an amended motion to compel discovery, requesting:

---

[9] Bilgi does not raise reliability as a basis for his discovery argument on appeal.

[10] In its findings of fact regarding Bilgi's motions to suppress, the trial court also stated, "This software program operation has additional features, like GPS [Global Positioning System] location service and subscriber inquiry service, but there is no evidence that any of those features were used in this defendant's case." CP at 1202 n.1.

> Callyo master source code, executable program files, user manual, installation manual, training manual, administrative manual, confidentiality or nondisclosure agreements between the State or law enforcement and the vendor of Callyo, requests for proposal and contracts between Washington State Patrol and Callyo, marketing materials provided to the State or law enforcement pertaining to Callyo, information concerning when the prosecuting attorney became aware of the use of Callyo and the existence of confidentiality agreements, and all Callyo files or reports pertaining to the case involving Mr. Bilgi.

*Id.* at 105-06. Bilgi moved the trial court to compel this discovery from Callyo's vendor if it was not within the possession or control of the State or WSP. He argued that discovery "pertaining to the functioning and use of the Callyo program" was necessary to develop various motions to suppress evidence and to prepare for cross-examination of the State's witnesses. *Id.* at 121.

A supplement to the amended motion to compel discovery added transcripts from interviews with Detectives Garden and Chovil-Peterson stating that they log in to Callyo to view communications in real time when they perform surveillance.

3.      MOTIONS HEARING

Bilgi argued that for "a surveillance team to monitor the communications as they are coming in and going out" is an interception in violation of the privacy act, and he requested "additional discovery to make a full and accurate record of what exactly happened here." 1 VRP (Mar. 25, 2019) at 9-10. He explained, "Of particular importance to me under the Privacy Act is, if there is any sort of documentation of when members of the surveillance team or other law enforcement officers logged in and were able to view communications as they were occurring." *Id.* at 21.

The State suggested that Bilgi was overestimating Callyo's role in the operation and described Callyo as "a data compilation program that lets you print out text messages." *Id.* at 22. It also argued that "ultimately it doesn't really matter what else Callyo can do. It only matters what

Callyo did, and in this case what it did is printed out the text messages." *Id.* at 33. Defense counsel admitted, "I can't say exactly what [Callyo] did in this case, unless we had access to the information to have a full and fair investigation of those issues." *Id.* at 37.

The trial court determined that Bilgi was requesting disclosure "beyond that which the prosecutor is specifically obligated to disclose," so it analyzed the request under CrR 4.7(e), which permits additional discovery within the trial court's discretion. CP at 913. CrR 4.7(e) requires (1) that the requested information be material to the preparation of the defense and (2) that the request be reasonable. *Id.* at 914. The trial court ruled that Bilgi failed to meet the first requirement because his reliability concerns were "no more than conjecture" and a copy of "the source code of any software that produced a transcript of the chat . . . does nothing to advance" the privacy issue. *Id.* at 915.

### 4. MOTION TO RECONSIDER

The trial court's ruling on Bilgi's discovery motion was based, in part, on its understanding that the State had turned over not only paper copies of the chats between Detective Pohl and Bilgi, but also copies of the Callyo reports "in electronic format, (zip files) . . . , which included the .txt files (metadata). The metadata allows one to see who created the document and when, who last modified it and when, and who can access or update it, as well as other information relevant to the foundation for admissibility." *Id.* at 911. Bilgi filed a motion to reconsider, explaining that he had not received the Callyo reports or text messages in a zip or .txt format. Once the State provided this evidence in its electronic format, the parties agreed that the State was in compliance with the trial court's discovery ruling.

Bilgi also argued again that "[a]ccess to logs or records indicating who had access to the livestream of the communications and who was logged into the Callyo program and able to view the communications is material to the Defendant's motion to suppress." *Id.* at 920. He submitted a transcript from an interview with Program Specialist Rhonda Tucker, where Tucker admitted that she accessed Callyo for her role as an analyst. She explained that when she is logged into Callyo, the phone numbers and messages "pop up" on the screen as the communications come in. *Id.* at 944. Tucker confirmed that she "can read that message as it is coming through," but she does "[n]ot usually" read the messages. *Id.* at 945-46.

The trial court denied Bilgi's motion to reconsider the ruling in its entirety. Bilgi then moved this court for discretionary review of the trial court's orders denying Bilgi's motions to compel discovery and for a stay while the orders were reviewed. We denied Bilgi's emergency motion for a stay, advising that any issue with the motion to compel could be reviewed on direct appeal.

5.     SECOND SUPPLEMENTAL MOTION TO COMPEL DISCOVERY

Bilgi filed an additional discovery motion, requesting:

> Callyo log files for users involved in the Net Nanny Thirteen Operation during the time period between July 26, 2018 (when communications with Mr. Bilgi began) and September 11, 2018 (when the Callyo files provided in discovery were downloaded from the program); usernames of Callyo users who were involved in the Net Nanny Thirteen Operation or Mr. Bilgi's arrest; Callyo manuals; MD5 hash values for all evidence files created, collected, or maintained by the Callyo program in connection with Mr. Bilgi's case; and the identity of the system administrator for the Callyo program at Washington State Patrol.

*Id.* at 995. He argued that interviews with law enforcement established a likely privacy act violation and that "the additional discovery sought is required for the defendant to conclusively establish the violation." *Id.* at 1001.

20

Bilgi attached a declaration from a digital forensics expert, Steve Simpson, explaining that if Simpson had access to log files from Callyo, meaning files that record "an action or event occurring on a computer device, a computer system, a computer network, or a computer application," then he could likely create an audit trail, which "documents the sequence of activities that have affected a specific operation, procedure, or event that occurs within a program or on a device." *Id.* at 955-56. An audit trail could show several things, including "[t]he date, time, and user name for each instance in which a user accessed text message communications between Mr. Bilgi and Detective Pohl," and "[w]hether other features of the Callyo program (e.g. the GPS location module or mobile bug module) were used in Mr. Bilgi's case." *Id.* at 957.

Simpson also explained how some of the other requested materials could be helpful, such as the user manuals, which would show the program's default settings, "describe what information users are able to access and how that information is accessed," and "identify which events are logged and how a particular program sorts, stores, and names log files." *Id.* at 958-59.

6.     SECOND MOTIONS HEARING

Bilgi made an offer of proof based on the interviews with Garden, Chovil-Peterson, and Tucker that Bilgi's messages had likely been intercepted in violation of the privacy act. However, he acknowledged, "the witnesses indicate they couldn't recall -- they didn't write reports detailing their specific viewing of communications in Mr. Bilgi's case." 3 VRP (May 20, 2019) at 133. Bilgi again requested additional discovery "to find evidence of a particular violation in this case since there was not an adequate record . . . , although it's undisputed that the program is used in that way [to monitor other officers' communications in real time]." *Id.*

21

The State argued that once Bilgi consented to the recording of his messages, he "[ran] the risk that the person who received them [would] disseminate them in any way that they want[ed] to, and that means they can show their friends, or have them live streamed if they want to." *Id.* at 149.

The trial court again denied Bilgi's motion to compel discovery, concluding that he again failed to show materiality: "the defendant's general claim that the material may be helpful and the general speculation that it might yield information do not suffice to establish materiality. The defendant must present some facts that would tend to show the material sought would be helpful to the defense being raised at this trial." CP at 1099.

B.    MOTIONS IN LIMINE

Bilgi moved in limine to exclude testimony on the general history and statistics of Net Nanny operations. In reviewing the motions with the parties, the trial court stated that it would allow the question of how many arrests had been made as a result of the Net Nanny operations, along with the expected answer of "a hundred plus" arrests. 3 VRP (May 20, 2019) at 197. Additionally, the trial court would allow defense counsel to draft and propose a limiting instruction explaining that this testimony is "to be used only for purposes of information or context, and should not prejudice the defendant in any way." *Id.* at 198. In its written order, the trial court denied Bilgi's motion to exclude "an estimated number of arrests resulting from the operations," without specifying an anticipated number, and it again advised that "defense counsel is allowed to propose a limiting instruction about the number of arrests." Supp. CP at 1256.

## II. TRIAL

At trial, Bilgi's defense focused on the intent element of attempted rape of a child and challenged the State's proof that Bilgi actually intended to have sexual intercourse with a child. In her opening statement, defense counsel told the jury, "[T]he State is attempting to have you convict Mr. Bilgi based on what is in Mr. Bilgi's mind, and the State doesn't have a magic machine that allows you to look into people's minds." 9 VRP at 819.

Detective Sergeant Rodriguez testified that as a result of Net Nanny operations, there had been "200 plus" arrests. *Id.* at 857. Bilgi did not object to this answer. Nor did he request a responsive limiting instruction.

In the State's closing argument, the prosecuting attorney first advised the jury, "[N]othing that I'm saying to you is my personal opinion. I represent the State of Washington and I'm speaking on behalf of the State of Washington. It's just easier to say 'I' than it is to say the 'State of Washington' every single time." 11 VRP at 1216. Bilgi objected, and the trial court overruled the objection. *Id.* at 1217.

The State then argued, "You were told in opening statement by the defense that the State has to prove what's in Mr. Bilgi's mind. That's not entirely accurate. What we have to prove is what he did." *Id.* at 1218. Bilgi objected, and the objection was overruled. *Id.* The State explained that the law requires proof of a substantial step because "we don't punish per se thinking about doing something, or talking about doing something. We punish for doing it." *Id.* at 1219. It summarized by saying,

> [T]he question is going to be: Did the State prove to you that Mr. Bilgi thought that he was talking to a 13 year old when he communicated for sexually immoral purposes, and did he take a substantial step towards the completion of the crime of Rape of a Child, 2.

*Id.*

In reviewing the elements of the crime, the State suggested, "[L]et's talk about what is not going to be disputed, so that we can then focus on what really is going to be disputed." *Id.* at 1221. Bilgi objected, claiming that this undermined the presumption of innocence, and the trial court overruled the objection. The State then argued, without objection, that the jurisdiction, time frame, and use of electronic communications were not disputed. It reasoned, "So really the only thing that we are talking about is what was in the defendant's head, and did he take a substantial step." *Id.*

The State reminded the jury, "What you have is the defendant getting into his car, driving over an hour, having lubricant and condoms with him when he shows up . . . . It doesn't seem like there is really a dispute about whether or not the defendant's conduct is a substantial step." *Id.* Bilgi objected, and the trial court overruled the objection. The State later argued, "Most of the evidence that was presented to you by the State was not contested and is not disputed." *Id.* at 1223. Bilgi again objected, and the trial court again overruled the objection.

Finally, the State recalled Detective Pohl's e-mail to Bilgi, wherein she stated that Jake was 13 years old. The State argued to the jury, "So to the extent that you hear argument about whether or not the State proved that this was a 13 year old, ask yourself what other evidence there is." *Id.* Bilgi objected, claiming that this constituted burden shifting, and the trial court overruled the objection. The State reiterated that the key question for the jury was "Did Mehmet Bilgi think that he was coming to that park to have sexual intercourse with a 13-year-old." *Id.* at 1224.

In the defense's closing argument, counsel suggested that there was insufficient proof of Bilgi's intent because he responded to an advertisement with an adult's picture on a website intended for adults. Counsel advised the jury,

> The elements that the State has to prove beyond a reasonable doubt . . . are intent, that Mr. Bilgi intended to have sex with a child age 12 or 13. And substantial step, that Mr. Bilgi took a substantial step that strongly corroborates that intent to have sex, not just sex generally, but sex with a child ages 12 or 13.

*Id.* at 1238. Counsel described the intent element as "the central focus." *Id.*

Defense counsel argued that Pohl did not "understand the community that she was operating in on Doublelist" because "Doublelist is a site that is intended for adults 18 and over" and "a site that has strict posting guidelines." *Id.* at 1240-41. Counsel compared Pohl to Rodriguez and suggested that, unlike Rodriguez, Pohl did not effectively target people who were actually interested in sex with children because she did not suggest a young age in her advertisement and she did not use an e-mail address that was consistent with her persona. Defense counsel encouraged the jury to "consider what Sergeant Rodriguez said about the importance of being clear about what it is that you are offering" and to compare that with "the fact that Detective Pohl only mentioned this age of 13 one time." *Id.* at 1244-45.

In its rebuttal, the State told the jury that this case is not "a referendum on Detective Pohl, . . . what she didn't do, what she could have done better, what she should have done different. . . . 200-plus arrests from the MECTF in over 15 operations." *Id.* at 1253. Bilgi objected to this statement, without providing a basis for the objection, and the trial court overruled it. *Id.*

The jury found Bilgi guilty as charged. Bilgi appeals his convictions.

ANALYSIS

I. DISCOVERY

Bilgi argues the trial court abused its discretion because it reviewed his discovery requests under the discretionary provision of the discovery rule, CrR 4.7(e), when he was entitled to

discovery under the mandatory provisions of the rule, CrR 4.7(a), (c), and (d). We disagree and hold that the trial court did not abuse its discretion.

A.    LEGAL PRINCIPLES

"The scope of discovery in a criminal case is within the sound discretion of the trial court and will not be disturbed absent a manifest abuse of discretion." *State v. Norby*, 122 Wn.2d 258, 268, 858 P.2d 210 (1993). The trial court abuses its discretion "if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Finch*, 181 Wn. App. 387, 395, 326 P.3d 148 (2014).

CrR 4.7(a) addresses the State's standard discovery obligations, including "any books, papers, documents, photographs, or tangible objects, which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belonged to the defendant." CrR 4.7(a)(1)(v). Evidence that the State intends to use in a hearing or trial has "inherent materiality." *State v. Boyd*, 160 Wn.2d 424, 437, 158 P.3d 54 (2007). This section also covers "any material or information within the prosecuting attorney's knowledge which tends to negate defendant's guilt as to the offense charged." CrR 4.7(a)(3). "The prosecuting attorney's obligation under this section is limited to material and information within the knowledge, possession or control of members of the prosecuting attorney's staff." CrR 4.7(a)(4).

In *Boyd*, our supreme court held that where a defendant is charged with offenses involving child pornography based on images on his computer, "adequate representation requires providing a 'mirror image' of that hard drive; enabling the defense attorney to consult with computer experts who can tell how the evidence made its way onto the computer." 160 Wn.2d at 436; *see also State v. Grenning*, 169 Wn.2d 47, 56, 234 P.3d 169 (2010). The court reasoned, "The evident purpose

of the disclosure requirement [in CrR 4.7(a)(1)(v)] is to protect the defendant's interests in getting meaningful access to evidence supporting the criminal charges in order to effectively prepare for trial and provide adequate representation." *Boyd*, 160 Wn.2d at 432. Where the defendant requests the evidence "offered to substantiate the criminal charges" against them, they are entitled to "meaningful access to copies" of the evidence under CrR 4.7(a). *Id.* at 432-33.

CrR 4.7(c), entitled "Additional Disclosures Upon Request and Specification," requires the prosecuting attorney to disclose, "upon request of the defendant," "any relevant material and information regarding . . . [t]he acquisition of specified statements from the defendant." CrR 4.7(c)(2). We have considered the State's disclosure obligation under CrR 4.7(c) to be limited " 'to material and information within the knowledge, possession or control of members of the prosecuting attorney's staff.' " *State v. Vance*, 184 Wn. App. 902, 911, 339 P.3d 245 (2014) (internal quotation marks omitted) (quoting *State v. Blackwell*, 120 Wn.2d 822, 826, 845 P.2d 1017 (1993)).

CrR 4.7(d) covers the disclosure of material and information in the possession of third parties. If the defendant requests and designates "material or information in the knowledge, possession or control of other persons which would be discoverable if in the knowledge, possession or control of the prosecuting attorney," then the prosecuting attorney must "attempt to cause such material or information to be made available to the defendant." CrR 4.7(d); *State v. Salgado-Mendoza*, 189 Wn.2d 420, 430, 403 P.3d 45 (2017). If the prosecuting attorney is unsuccessful, "and if such material or persons are subject to the jurisdiction of the court," then the court must issue subpoenas or orders to obtain the information. CrR 4.7(d). However, the trial court is only required to issue subpoenas under CrR 4.7(d) if the requested information is material to the

defense. *See Blackwell*, 120 Wn.2d at 827-28 ("Assuming the records were shown to be material to the defense, the trial court should have issued a subpoena pursuant to CrR 4.7(d)."); *State v. Kilgore*, 107 Wn. App. 160, 176, 26 P.3d 308 (2001) ("[I]f A.B.'s testimony negated guilt, the trial court should have subpoenaed A.B.").

Finally, CrR 4.7(e)(1) allows the trial court to authorize disclosure of "relevant material and information not covered by sections (a), (c) and (d)." But unlike sections (a), (c), and (d), which involve mandatory disclosures, disclosure under (e) is within the trial court's discretion. The trial court "in its discretion may require disclosure" of additional relevant material, if the defendant shows the information's "materiality to the preparation of the defense" and if "the request is reasonable." CrR 4.7(e)(1). The trial court abuses its discretion if it orders discovery under CrR 4.7(e) without requiring a showing of materiality. *Finch*, 181 Wn. App. at 396.

To show materiality under CrR 4.7(e), the defendant must "provide some factual basis making it reasonably likely that the requested evidence would give rise to information material to the defense." *Id.* It is not enough to make "broad, unsupported" claims that the requested disclosures "*may* lead to material information." *Blackwell*, 120 Wn.2d at 829.

B.    APPLICATION

Here, the trial court did not abuse its discretion in denying Bilgi's discovery motions. The requested materials did not fall within the prosecutor's standard disclosure obligations under CrR 4.7(a) because the State was not intending to use documents describing how Callyo operates at any hearings or at Bilgi's trial, and these documents did not tend to negate Bilgi's guilt for the charged crime. The State used downloaded spreadsheets of Bilgi's communications to substantiate the charges against him, and the State satisfied its obligations under *Boyd* and *Grenning* when it

provided electronic copies of these conversations. It was not obligated under CrR 4.7(a) to provide additional documentation detailing how the Callyo software operated.

Bilgi was not entitled to the requested discovery under CrR 4.7(c) either. Although Callyo was the software used to record Bilgi's statements, its executable files, source code, and user manuals were not relevant to Bilgi's claims that law enforcement unlawfully intercepted the communications. The important facts here were that Bilgi's messages were received by the intended recipient, that he impliedly consented to their recording, and that he assumed the risk of their content being shared. The trial court correctly concluded that a copy of "the source code of any software that produced a transcript of the chat . . . does nothing to advance" the privacy issue. CP at 915.

Because the requested discovery would not have been "discoverable if in the knowledge, possession or control of the prosecuting attorney" under CrR 4.7(a) or (c), the trial court was not required to issue subpoenas to WSP or Callyo's vendor under CrR 4.7(d).

Since Bilgi's discovery requests did not fall under the State's standard discovery obligations, the trial court correctly reviewed the requests under CrR 4.7(e). Bilgi needed to "provide some factual basis making it reasonably likely that the requested evidence would give rise to information material to the defense." *Finch*, 181 Wn. App. at 396.

Bilgi submitted several patent applications illustrating "a non-exhaustive set of possible embodiments of the technology," CP at 114, but he admitted that he "[could not] say exactly what [Callyo] did in this case," 1 VRP (Mar. 25, 2019) at 37. Details on how Callyo *could* operate were not material to Bilgi's privacy act claim, which necessarily challenged how MECTF actually used

Callyo in his case. Interviews with law enforcement showed only that MECTF used Callyo to send and download text messages, and to occasionally view one another's communications.

Even if Bilgi had gathered additional information showing exactly when specific messages were viewed by specific officers, this would not have established a privacy act violation. As discussed above, it is not an unlawful interception to log in to a shared account and view messages intentionally sent to that account. Bilgi consented to the recording of his written communications, and Rodriguez and Pohl lawfully permitted others to access and view those messages. Bilgi failed to show how the requested discovery could give rise to information material to his defense, so the trial court did not abuse its discretion in denying Bilgi's motions to compel additional discovery.

## II. PROSECUTORIAL MISCONDUCT

Bilgi also contends that prosecutorial misconduct during closing argument violated his rights to due process and a fair trial. Specifically, Bilgi claims the prosecuting attorney invoked the prestige of his office, misstated the law, shifted the burden of proof, and argued facts not in evidence to appeal to the jury's passions. We disagree.

### A.    LEGAL PRINCIPLES

Prosecutorial misconduct may deprive a defendant of their constitutional right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington Constitution. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012) (plurality opinion). We review the prosecutor's arguments " 'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given.' " *State v. Thierry*, 190 Wn. App. 680, 689, 360 P.3d 940 (2015) (quoting *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994)).

To establish prosecutorial misconduct, a defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected to the alleged misconduct at trial, as Bilgi did in each of the instances challenged here, then they may establish prejudice by showing that the misconduct "had a substantial likelihood of affecting the jury's verdict." *Id.*

Prosecuting attorneys " 'are permitted latitude to argue the facts in evidence and reasonable inferences' in their closing arguments." *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (quoting *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). They cannot, however, argue facts that are not in the record or appeal to the passions and prejudices of the jury. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). They cannot use their "position of power and prestige to sway the jury" or to "express an individual opinion of the defendant's guilt, independent of the evidence actually in the case." *Glasmann*, 175 Wn.2d at 706. They cannot misstate the law. *State v. Jones*, 13 Wn. App. 2d 386, 403, 463 P.3d 738 (2020).

It is also "flagrant misconduct to shift the burden of proof to the defendant." *State v. Miles*, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007). The prosecuting attorney is not permitted to "comment on the lack of defense evidence because the defendant has no duty to present evidence." *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). However, "a prosecutor is entitled to point out the . . . lack of evidentiary support for the defense theory of the case." *State v. Osman*, 192 Wn. App. 355, 367, 366 P.3d 956 (2016).

In *Osman*, for example, the defendant was charged with unlawful imprisonment and assault, and the prosecutor asked the jury, "If a struggle or some type of confrontation didn't occur in the car[,] how did that earring come out of her ear and get left on the floor and how did she

break those fingernails if an encounter did not, and a struggle, did not occur?" *Id.* Division One held that this argument did not shift the burden of proof because it focused on the evidence presented. *Id.* at 368. Rather than suggesting that "the defense had failed to offer another reasonable explanation" for the misplaced earring and broken fingernails, "the prosecutor argued that *the evidence* did not support any other reasonable explanation." *Id.* at 367.

B.      APPLICATION

        1.      PRESTIGE OF THE OFFICE

Bilgi first challenges the prosecuting attorney's assertion that he was "speaking on behalf of the State of Washington" as an improper invocation of the prestige of his office. 11 VRP at 1216. But the prosecuting attorney was representing the State, and he offered this clarification to avoid having his statements misconstrued as personal opinions. He expressly cautioned the jury, "[N]othing that I'm saying to you is my personal opinion. I represent the State of Washington and I'm speaking on behalf of the State of Washington." *Id.* It was not improper to offer this clarification.

        2.      MISSTATING THE LAW

Next, Bilgi contends that the prosecuting attorney misstated the law on intent when he argued that the State was not required "to prove what's in Mr. Bilgi's mind." *Id.* at 1218. However, we review the prosecutor's arguments " 'in the context of the total argument.' " *Thierry*, 190 Wn. App. at 689 (quoting *Russell*, 125 Wn.2d at 85-86). The State repeatedly told the jury that what Bilgi thought about the arranged meeting was critical to a determination of his guilt. Therefore, in the context of the State's entire argument, the brief comment that the State did not have to prove what was "in Mr. Bilgi's mind" was not prejudicial. 11 VRP at 1218. Moreover, this comment was

made in response to defense counsel's opening argument: "[T]he State is attempting to have you convict Mr. Bilgi based on what is in Mr. Bilgi's mind, and the State doesn't have a magic machine that allows you to look into people's minds." 9 VRP at 819.

3.     SHIFTING THE BURDEN OF PROOF

Bilgi claims the prosecuting attorney improperly shifted the burden of proof when he told the jury that reasonable doubt requires a witness "who comes in here and says [Bilgi] didn't do it" and when he remarked that there was no evidence indicating Bilgi did *not* intend to meet up with a 13-year-old child. 11 VRP at 1230. Bilgi argues these statements "convey the defendant had a duty to testify, or to present witnesses on his own behalf." Br. of Appellant at 45. He also claims it was improper for the prosecutor to suggest that some of the elements of the crime were not disputed.

First, it is clear from context that when the prosecuting attorney referenced a witness "who comes in here and says [Bilgi] didn't do it," he was not defining "reasonable doubt." 11 VRP 1230. He was merely giving an example of evidence that could generate a reasonable doubt. He immediately followed this statement with an assertion that reasonable doubt could also arise from the State failing to present sufficient evidence. This is consistent with the trial court's instruction that "[a] reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence." CP at 1111.

Second, when the prosecuting attorney asked the jury, "So to the extent that you hear argument about whether or not the State proved that this was a 13 year old, ask yourself what other evidence there is," he was permissibly arguing based on the evidence presented. 11 VRP at 1223. He did not say that Bilgi should have testified about what he was thinking or that Bilgi should have

33

countered the State's evidence by calling his own witnesses. Like the counsel in *Osman*, the prosecuting attorney challenged whether *the evidence* supported the defense's theory of the case.

Third, although it may have been improper to claim that Bilgi did not dispute the State's characterization of his conduct as a substantial step, Bilgi did not directly challenge this evidence in his closing argument—that Bilgi drove to the park with lubricant and condoms in his car. Bilgi noted that the State needed to prove beyond a reasonable doubt that he "took a substantial step that strongly corroborates that intent to have sex, not just sex generally, but sex with a child ages 12 or 13, and that that step was more than mere preparation." *Id.* at 1238. But he did not challenge the State's assertion that he went to the park for a sexual encounter. He challenged only the State's characterization of who he expected to meet and described the intent element as "the central focus." *Id.* Therefore, any impropriety in the State's suggestion that this element was not controverted was not prejudicial.

### 4. "200 PLUS" ARRESTS

Bilgi also claims the State argued facts not in evidence and made an emotional appeal to the jury when it stated in its rebuttal, "200-plus arrests from the MECTF in over 15 operations." *Id.* at 1253.

This information was part of the evidence presented. The trial court denied Bilgi's motion to exclude questions about "an estimated number of arrests resulting from the operations." Supp. CP at 1256. On direct examination, Detective Sergeant Rodriguez testified there had been "200 plus" arrests as a result of Net Nanny operations. 9 VRP at 857.

The prosecuting attorney did not use this statistic to appeal to the jury's emotions or to emphasize the operations' importance. Rather, he highlighted the success of the operations in

No. 53464-9-II

response to defense counsel's suggestion that Detective Pohl did not know what she was doing or should have conducted her investigation differently. Further, the defense could have proposed a limiting instruction to guide the jury's consideration of information related to other Net Nanny operations, but it did not. Bilgi failed to show that any of the prosecutor's arguments were both improper and prejudicial.

## CONCLUSION

The trial court did not abuse its discretion when it denied Bilgi's motions to compel additional discovery, and the prosecuting attorney did not commit reversible misconduct. Therefore, we affirm Bilgi's convictions.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, C.J.

35