**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

          Respondent,

       v.

ADAM BRANTLY MYERS,

          Appellant.

No. 83588-2-I

DIVISION ONE

ORDER DENYING MOTION
FOR RECONSIDERATION
AND WITHDRAWING AND
SUBSTITUTING OPINION

Respondent filed a motion for reconsideration on June 26, 2023. A panel of the court called for an answer on June 28, 2023. Appellant filed an answer to the motion on July 13, 2023. After review of the motion and answer, a panel of this court has determined that the motion for reconsideration should be denied. The panel has also determined that the opinion filed on June 5, 2023 should be withdrawn and a substitute opinion filed.

Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on June 5, 2023 shall be withdrawn and a substitute opinion shall be filed.

FOR THE COURT:

_____

For the current opinion, go to https://www.lexisnexis.com/clientel/lwareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>  v.<br><br>ADAM BRANTLY MYERS,<br><br>     Appellant. | No. 83588-2-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

HAZELRIGG, A.C.J. — Adam Myers appeals from a jury conviction for robbery in the first degree. Myers contends the trial court erred by denying his pretrial CrR 8.3(b) motion to dismiss due to governmental misconduct. He also assigns error to the denial of a for cause challenge to a juror. The first issue is independently dispositive, and accordingly, we reverse and remand for further proceedings.

FACTS

The State charged Adam Myers with one count of robbery in the first degree based on an incident at a Wells Fargo bank in the city of Snohomish, Washington. On April 26, 2021, the day of the reported robbery, Detective Judith Saarinen responded to the scene and took over as the primary investigator. Saarinen was

an employee of the Snohomish County Sheriff's Office (SCSO), but was assigned as a detective for the city of Snohomish, which contracts with Snohomish County to provide police services for the Snohomish Police Department (SPD). During her initial investigation, Saarinen discovered that the robbery suspect had passed a handwritten note to one of the bank tellers. Saarinen then received digital photos and surveillance footage of the suspect from the day of the incident and ultimately identified Myers as a suspect. Myers was arrested on May 2, 2021. SPD officers later searched Myers' residence pursuant to a search warrant and located a handwritten note that appeared to be the one given to the bank teller.

On September 21, 2021, Tyler Scott, the deputy prosecuting attorney (DPA) handling Myers' case, sent an e-mail to Myers' trial counsel. In the e-mail, Scott explained that the investigation had resulted in the discovery of a letter written by Myers to his former landlord and, in an effort to compare the handwriting, SCSO corrections deputies had seized five documents from Myers' jail cell. According to Scott, Saarinen called him and stated that she received photographs of the documents and became concerned that they contained privileged attorney-client communications. To determine whether they were in fact privileged, Scott then directed that the documents be reviewed by an "uninvolved detective," SCSO Detective David Bilyeu, who indicated that several[1] of the five documents that were ultimately seized may have contained attorney-client communications.

---

[1] Though Scott's e-mail states that Bilyeu had determined three of the five documents may have contained attorney-client privileged communications, Bilyeu later testified he believed four of them did.

- 2 -

No. 83588-2-I/3

On September 27, 2021, Myers moved to dismiss the case under CrR 8.3(b) based on governmental misconduct. At the hearing on the motion to dismiss, the testifying witnesses included Snohomish County Jail Corrections Deputy Pavel Ryakhovskiy, Bilyeu, Saarinen, and Myers. At the conclusion of the hearing, the trial court found that a state actor had infringed on Myers's Sixth Amendment right to counsel but that the State had rebutted the presumption of prejudice by proof beyond a reasonable doubt. Accordingly, the trial court denied Myers' CrR 8.3(b) motion and instead ordered a lesser remedy of suppression of the documents collected from Myers' jail cell. In late November 2021, Myers' case proceeded to trial and the jury found him guilty as charged.

Myers timely appealed.

ANALYSIS

I.      CrR 8.3(b) Motion to Dismiss for Governmental Misconduct

Myers assigns error to numerous findings of fact and conclusions of law (FFCL) entered pursuant to the trial court's order denying his CrR 8.3(b) motion to dismiss. Myers contends that the trial court erred in denying his motion and in ordering the lesser remedy of suppression, because the State violated his Sixth Amendment right to counsel when it intercepted and seized privileged communications and failed to prove beyond a reasonable doubt that no prejudice resulted from that violation.

CrR 8.3(b) provides that a trial court "may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial."

- 3 -

No. 83588-2-I/4

"Dismissal under CrR 8.3(b) requires a showing of arbitrary action or governmental misconduct, but the governmental misconduct need not be of an evil or dishonest nature; simple mismanagement is enough." State v. Brooks, 149 Wn. App. 373, 384, 203 P.3d 397 (2009). This court "review[s] the trial court's decision to deny a motion to dismiss under CrR 8.3 for abuse of discretion, that is, whether the decision was manifestly unreasonable, based on untenable grounds, or made for untenable reasons." State v. Kone, 165 Wn. App. 420, 433, 266 P.3d 916 (2011). A decision is based on untenable grounds or made for untenable reasons when it is "reached by applying the wrong legal standard," and a decision is manifestly unreasonable when "it falls outside the range of acceptable choices, given the facts and the applicable legal standard." State v. Horn, 3 Wn. App. 2d 302, 312, 415 P.3d 1225 (2018). "[A]ppellate courts retain the authority to clarify and refine the outer bounds of the trial court's available range of choices and, in particular, to identify appropriate legal standards." State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

"The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel, which includes the right to confer privately with that counsel." State v. Peña Fuentes, 179 Wn.2d 808, 811, 318 P.3d 257 (2014) (citing U.S. CONST. amend. VI). "State intrusion into those private conversations is a blatant violation of a foundational right." Id. In State v. Irby, this court clarified and reiterated the four-part inquiry used to properly analyze a CrR 8.3(b) motion to dismiss based on the State's violation of the defendant's Sixth Amendment right:

1. Did a state actor participate in the infringing conduct alleged by the defendant?

- 4 -

No. 83588-2-I/5

2. If so, did the state actor(s) infringe on a Sixth Amendment right of the defendant?

3. If so, was there prejudice to the defendant? That is, did the State fail to overcome the presumption of prejudice arising from the infringement by not proving the absence of prejudice beyond a reasonable doubt?

4. If so, what is the appropriate remedy to select and apply, considering the totality of the circumstances present, including the degree of prejudice to the defendant's right to a fair trial and the degree of nefariousness of the conduct by the state actor(s)?

3 Wn. App. 2d 247, 252-53, 415 P.3d 611 (2018).  Here, the first two prongs are not at issue as the parties agree that the conduct of state actors resulted in the infringement of Myers' constitutional right to private communication with his attorney.  The trial court properly found, and the State did not dispute, that Ryakhovskiy, Bilyeu, and Saarinen were all state actors.[2]  Before addressing the third and fourth prongs of the Irby test, we review the evidence adduced at the hearing on the CrR 8.3(b) motion and the facts expressly found by the court.

On September 14, 2021, while Myers was in custody at the Snohomish County Jail, Saarinen learned that Myers' former landlord had received a letter from him.  The letter, which was written in cursive, contained a confession indicating that Myers was forced to rob the bank by an individual who had threatened him with a gun.  In order to obtain a known handwriting sample to compare with the letter, Saarinen phoned jail booking desk and requested any

---

[2] The trial court also concluded that "[a] state actor participated in infringing conduct when the defendant's legal documents were photographed."  Because this conclusion of law is unchallenged, it becomes the law of the case.  State v. Bilgi, 19 Wn. App. 2d 845, 855, 496 P.3d 1230 (2021), review denied, 199 Wn.2d 1002, 504 P.3d 827 (2022).

- 5 -

kites[3] that Myers had submitted. The jail provided Saarinen one kite believed to have been written by Myers.[4]

On September 15, 2021, Saarinen consulted with a forensic scientist at the Washington State Patrol Crime Laboratory who advised that handwriting comparison could be conducted, but that it would be "beneficial to have additional documents with cursive writing, and several known handwriting documents." She then e-mailed the jail intelligence unit at the Snohomish County Jail, seeking additional handwriting samples from Myers that could be used to compare to the cursive handwriting in the letter. Ryakhovskiy responded to Saarinen's request via e-mail and told her that he would search Myers' jail cell. Shortly thereafter, Ryakhovskiy entered Myers' cell, noticed several handwritten papers on the desk, and took photographs of 10 different documents. The record does not establish how many of those documents were printed or written in cursive and, therefore, responsive to the guidance of the forensic scientist. Ryakhovskiy then e-mailed those 10 photographs to Saarinen.

Saarinen testified that, after she opened the e-mail and began saving the files on her computer, she saw a document with the date April 26 titled "the story", another document with the word "haircut," and another with the phrase "notes about defense." She explained that, at that point, she became concerned the documents may contain privileged material, so she closed her e-mail and did not

---

[3] "Kites" are written jail communications from incarcerated people to jail or medical staff or to their lawyers.

[4] When asked whether that kite was written in cursive or print, Saarinen stated that she "believe[d] it was print." When she was asked if she had a cursive handwriting exemplar (known sample) from Myers at that point in the investigation, she testified that she had obtained "a potential signature of his."

read anything further. She then contacted DPA Scott and informed him about her concerns regarding the documents, and the two of them developed a plan to retain them in order to determine whether they contained privileged communications. Saarinen deleted the folder where she had begun to save the images and then emptied the recycle bin on her computer, however, she retained the original e-mail from Ryakhovskiy with the images attached.

Based on her conversation with Scott, Saarinen asked Ryakhovskiy to return to Myers' cell and seize documents "that could be described as <u>not appearing to be legal documents</u>." (Emphasis added.) The following day, Ryakhovskiy went back and took 5 documents "that looked like just notes," but he later asserted, in his testimony at the motion hearing, that he did not read the contents of the documents he seized. Each of the 5 documents he collected were included in the pictures that he had previously sent to Saarinen. According to Ryakhovskiy, he determined which documents might contain privileged communications by the "type of paper and then how neat they were written"; of the 10 documents he had originally photographed, Ryakhovskiy decided against removing those that were written on lined paper[5] and were "neat." None of these documents contained a cursive handwriting exemplar, despite the earlier instructions from the crime lab as conveyed by Saarinen. Ryakhovskiy removed and kept the other documents in his desk until Bilyeu met him at the jail to collect them a few days later. Bilyeu reviewed each of the 5 documents and "considered

---

[5] Ryakhovskiy's description of the type of paper varied, he first described it as "lined legal paper," but then backtracked as to whether it was legal size or letter size, yellow or white.

- 7 -

four to fall in the category of attorney-client privilege." The 1 document that did not contain privileged information was a jail kite.

After the conclusion of testimony on the motion, the court heard argument from the parties and issued its ruling just over two weeks later. In the recitation of relevant facts in its oral ruling, which were expressly incorporated into the written FFCL,[6] the court found Ryakhovskiy "did not share the documents with the prosecutor or anyone else," but the deputy expressly testified, and all of the government actors appeared to agree, that he not only shared them with Bilyeu but did so at the direction of the DPA.[7]

The court further found that Scott directed Saarinen to have an "uninvolved detective" assigned to retrieve Myers' documents and review them "to determine if they contained privileged information." It also noted that Bilyeu testified "he is aware that attorney-client privileged information should not be in the possession of the prosecutor or law enforcement as it maintains a case." The court went to some lengths to make clear that Bilyeu worked in a different department than

---

[6] In his opening brief, Myers assigns error to a number of the findings of fact (34-38, 63, 65-68) and conclusions of law (3-5) entered by the trial court. We review challenged findings to determine whether substantial evidence supports them. State v. Dobbs, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). We review conclusions of law de novo to determine whether they are supported by the findings of fact. State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997)

However, Myers fails to offer argument as to how findings 34-38, 63, or 65-67 are not supported by substantial evidence, particularly given that they rest on the judge's credibility determinations. This court does not review the credibility determinations made by the trial court. State v. Cross, 156 Wn. App. 568, 581, 234 P.3d 288 (2010). Accordingly, we decline to review those findings rooted in the court's determinations as to credibility or for which no argument is presented.

Finding 68 and conclusion 4 are analyzed in detail in Parts A and B, and conclusions 3 and 5 in Part C, infra.

[7] The court's various findings on these points are inconsistent and, at times, directly contradictory. In the written FFCL, the court found both that Ryakhovskiy "did not share or disseminate the documents with anyone" (Finding 44) and that he "did not disseminate the documents to anyone other than Detective Saarinen (via email) and then provided the original documents to Detective Bilyeu." Finding of Fact 61 (emphasis added).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Saarinen, that Ryakhovskiy did not enter Myers' cell "for a nefarious purpose," and that the DPA "does not intend to use any of the documents at trial." Findings like these, and the court's conclusion that "the defendant has failed to plead or demonstrate actual prejudice in this case," clearly establish that the court both misinterpreted and misapplied the controlling authority on the issue presented by Myers' motion. As a starting point, conclusion of law 2 states that the entirety of the infringing conduct was when "the defendant's legal documents were photographed," which establishes that the judge failed to recognize each separate infringement of Myers' constitutional rights by various government actors.[8] This fundamental misunderstanding is further demonstrated by the court's concluding remarks just before it denied the motion, "the conduct here does not rise to the level of egregiousness where prejudice should be presumed," which directly contradicts well-settled case law.

### A. Prejudice Is Presumed

The third prong of the test as articulated in Irby requires the court to address whether the defendant was prejudiced by the State's misconduct. 3 Wn. App. 2d at 256-57. Once it is established that the State has violated the defendant's Sixth Amendment right, there is a presumption of prejudice to the defendant that can be rebutted only if the State proves beyond a reasonable doubt that the defendant suffered no prejudice. Peña Fuentes, 179 Wn.2d at 819-20. Because the "constitutional right to privately communicate with an attorney is a foundational

---

[8] The separate and compounded infringements are reviewed greater detail in Part C, infra.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

right," the State must be held to the "highest burden of proof to ensure that it is protected." Id. at 820. Myers argues the trial court erroneously concluded that the State met this burden.

As a preliminary matter, the court appeared disinclined to even apply the required presumption of prejudice once it had determined that a state actor infringed on Myers' right to counsel by intercepting privileged communications. In issuing its oral ruling on the motion, the court stated:

> [T]he conduct here does not rise to the level of egregiousness where prejudice should be presumed. As such, this court cannot find that arbitrary government action or misconduct that prejudices the defendant and materially affects the defendant's right to a fair trial has occurred.

This is a clear misinterpretation and misapplication of the controlling authority. The determination of prejudice is not dependent on the court's assessment of the intention of the government actors or the degree of interference with the Sixth Amendment rights of the accused; it is presumed. While conclusion 4 says the "State overcame a presumption of prejudice," the oral ruling establishes that the court's starting point in the analysis was misguided, both in its clear reluctance to apply the required presumption and its assertion that Myers' failed to demonstrate prejudice. Over a half-century of case law explicitly holds that where government acts interfere in the attorney-client relationship by intercepting privileged communications, prejudice is presumed. Where the court had already found that Ryakhovskiy, Saarinen, and Bilyeu were state actors and they variously possessed

No. 83588-2-I/11

or read the privileged communication, Myers was not required to make any additional showing of prejudice.[9]

In State v. Cory, our Supreme Court reversed a conviction and ordered dismissal of five counts of "second-degree burglary and larceny" due to the State's violation of Cory's Sixth Amendment right, which occurred when sheriff's deputies recorded and listened to conversations he had with counsel while in the county jail. 62 Wn.2d 371, 372, 378, 382 P.2d 1019 (1963). The court emphasized that there was "no way to isolate the prejudice resulting from an eavesdropping activity, such as this." Id. at 377. Accordingly, the court assumed that the information gained by the sheriff was provided to the prosecutor, noting that "the opportunity and the motive were there and the defendant ha[d] no way of knowing what was communicated to the prosecutor." Id. at 377 n.3. The court in Cory quoted the United States Supreme Court for the proposition that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." Glasser v.

---

[9] Citing examples of prejudice provided in State v. Garza, the State argues the only way Myers could have been prejudiced here was "that the intrusions ha[d] destroyed [Myers'] confidence in [his] attorney." 99 Wn. App. 291, 301, 994 P.2d 868 (2000). According to the State, however, "this was not such a case" because Myers' counsel was not involved in the State's misconduct and "his attorney responded by filing a motion to dismiss the case based on the violation." The State further contends that Myers' posttrial motion for new counsel demonstrated that the intrusion had not "destroyed [Myers'] confidence" in his attorney because "[n]othing in the defendant's motion argued or suggested that he was concerned with his attorney's performance because of the privileged documents."

First, the mere fact that his counsel was not involved in the misconduct does not establish beyond a reasonable doubt that there was no harm to the attorney-client relationship. Second, the four examples of prejudice listed in Garza were not exhaustive and the State's argument that other types of prejudice "could not have occurred" requires a thorough examination by the trial court on remand. Finally, the examples set out in Garza were prefaced with the following language: "even if there is no presumption of prejudice, the defendants still may demonstrate prejudice by demonstrating . . . ." Id. (emphasis added). Because prejudice is presumed here and the burden is on the State to disprove it, Myers' posttrial motion and argument therein is not determinative on this issue.

- 11 -

No. 83588-2-I/12

United States, 315 U.S. 60, 76, 62 S. Ct. 457, 86 L. Ed. 680 (1942), quoted in Cory, 62 Wn.2d at 376.

In Peña Fuentes, the court expanded on Cory and explained that only when "there is no possibility of prejudice to the defendant" resulting from an eavesdropping violation of a defendant's Sixth Amendment right is dismissal of the charges not "required." 179 Wn.2d at 819 (emphasis added). However, the court continued, even in those "rare circumstances where there is no possibility of prejudice," the presumption of prejudice remains unless and until the State proves beyond a reasonable doubt that there was no prejudice suffered by the defendant due to the Sixth Amendment violation. Id. at 819-20. In that case, Peña Fuentes was incarcerated pending trial on one count of rape of a child in the first degree, three counts of child molestation in the first degree, and three counts of child molestation in the second degree. Id. at 812. The prosecutor asked a detective to listen to Peña Fuentes' telephone calls from jail; the detective listened to six conversations between Peña Fuentes and his attorney. Id. at 816. The prosecutor told the detective to stop listening to the calls and not to disclose the content of those conversations with anyone. Id. at 817. The prosecutor then informed defense counsel and submitted a declaration stating that the detective had not disclosed the substance of the communications. Id. Because the record was unclear on whether the trial court held the State to its burden of proving that no prejudice resulted from the eavesdropping violation, the court reversed the trial court's denial of Peña Fuentes' motion to dismiss and remanded to the trial court. Id. at 820.

- 12 -

No. 83588-2-I/13

Similarly, in Irby, this court reversed the trial court's order denying Irby's CrR 8.3 motion to dismiss and remanded for further proceedings. 3 Wn. App. 2d at 250. Irby's motion was based on the misconduct of corrections deputies at the jail who had opened his outgoing mail containing privileged communications intended for his attorney. Id. at 251. Although the trial court concluded that the corrections deputies' conduct had violated Irby's Sixth Amendment right to counsel, it placed the burden on Irby to show prejudice, reasoning that "state misconduct by law enforcement is more likely to prejudice a defendant's fair trial right than is state misconduct by jail security." Id. at 251, 257. On review, this court rejected the trial court's distinction between corrections deputies and other law enforcement officers and held that the judge had erred by not applying the presumption of prejudice. Id. at 258-59. We then looked to the evidence the State provided to demonstrate a lack of prejudice, primarily, the prosecutor's declaration in which he attested he was not aware of the contents of the privileged communications. Id. at 260-61. Because that declaration "did not eliminate the possibility that Irby's right to a fair trial was prejudiced," we concluded that the record did not establish that the State had met its burden to prove beyond a reasonable doubt that Irby was not prejudiced. Id. at 262.

As the trial judge did in Irby, the trial court here, too, appears to draw a false distinction between types of state actors: the law enforcement officers involved in investigating and prosecuting Myers' pending criminal charges and those in other units of the same agency who were not assigned to the case at issue. The panel in Irby was clear: where the court attempted to delineate and apportion prejudice

- 13 -

based on the roles of the state actors, "[t]he trial court's reasoning was flawed." Id. at 257. Bilyeu was a government actor who expressly received, retained, and reviewed Myers' privileged communications to counsel at the express direction of other government actors. Accordingly, finding 68, which states that Myers "was not prejudiced when a state actor obtained his letter," is contradicted by the record and inconsistent with the law as set out in Peña Fuentes, which clearly holds, "State intrusion into those private [attorney-client] conversations is a blatant violation of a foundational right." 179 Wn.2d at 811. The trial court abused its discretion by misapplying controlling law as to the presumption of prejudice and issuing findings contrary to the law and evidence.

B.      State Must Disprove Prejudice Beyond a Reasonable Doubt

With the presumption of prejudice as the starting point, the court was required to hold the State to its burden to disprove any prejudice to Myers beyond a reasonable doubt. While here the court so concluded, the record again establishes that it applied an improper standard. Irby relies on Peña Fuentes to reiterate that a simple declaration (or in this case, testimony) from the prosecutor that the detective did not communicate the privileged information to them was insufficient to carry the State's burden. 3 Wn. App. 2d at 260-61. Here, Saarinen assured the court that she did not read the contents of the privileged communication (but also specifically recalled precise wording contained in some of the documents) and the DPA purportedly declared under penalty of perjury[10] that he did not read or become aware of the contents of the intercepted

_____
[10] No such declaration is in the record transmitted on appeal.

- 14 -

communications. However, while Saarinen testified, and the trial court accepted as true, that she did not read the documents in the photographs other than certain specific words, she never confirmed that the subsequent steps she took in the work up of Myers' case were not influenced in any way by the interception of his privileged communication or the information contained therein. Under the plain language of Peña Fuentes and Irby, these claims of ignorance by certain key government actors are insufficient to meet the State's appropriately high burden of proof.

More critical to our conclusion that the court applied the wrong standard is the fact that there is definitive evidence in the record that a government actor unquestionably read the privileged attorney-client communications. Bilyeu expressly confirmed that he reviewed the documents in their entirety. Further, he testified that he did so at the explicit direction of the lead detective on the case with the agreement of the attorney representing the people of the State of Washington in prosecuting the case against Myers. Regardless of the purpose behind the intrusion into the protected attorney-client relationship (here, purportedly to have a nonlawyer make the definitive legal determination as to whether they were, in fact, privileged communications), there is uncontroverted evidence in the record of a state actor reading protected correspondence.

Further, conclusion of law 4, which Myers also challenges, says, "The State overcame a presumption of prejudice when it established beyond a reasonable doubt that the defendant's right to a fair trial was not prejudiced by the procedure implemented in this case." Setting aside the fact that this conclusion does not

- 15 -

properly flow from the findings, in part, for the reasons set out above, it further demonstrates the court's use of an incorrect legal standard. This conclusion sets out the standard for CrR 8.3(b) motions generally, but fails to apply the overlay required when the motion is premised on a violation of the Sixth Amendment based on interception of privileged communication. Myers' right to a fair trial is impacted by his denial of the Sixth Amendment right to counsel because the government intruded on that protected relationship. Cory establishes that this is the question at the heart of the inquiry when the court is presented with a CrR 8.3(b) motion in this particular procedural posture:

> It is also obvious that an attorney cannot make a "full and complete investigation of both the facts and the law" unless [they] ha[ve] the full and complete confidence of [their] client, and such confidence cannot exist if the client cannot have the assurance that [their] disclosures to [their] counsel are strictly confidential.

62 Wn.2d at 374 (quoting State v. Hartwig, 36 Wn.2d 598, 601, 219 P.2d 564 (1950)). While it is clear the court considered whether the lead detective or DPA had access to any defense strategy as a result of the violation, the record before us is silent on whether the trial court ever actually considered the government misconduct that gave rise to the motion to dismiss in the first place, the very breach of the confidentiality promised to an accused person when communicating with their counsel. This misapplication of the guiding standard is also an abuse of discretion.

No. 83588-2-I/17

C.    Fashioning an Appropriate Remedy Considering the Totality of Circumstances

The final step in the analysis set out in Irby is to determine the appropriate remedy, "considering the totality of the circumstances present, including the degree of prejudice to the defendant's right to a fair trial and the degree of nefariousness of the conduct by the state actor(s)."  3 Wn. App. 2d at 252-53.  As to a remedy for the violation of Myers' rights under the Sixth Amendment, the court's conclusion suffers from the same misapplication of the law that infiltrated its consideration of the third prong under Irby in that the court seemed to minimize the conduct by the government officials and only begrudgingly conclude that Myers was prejudiced.  In its ruling denying the motion to dismiss, the court expressly stated:

> While the State's decision to use a detective from the same agency, albeit one unconnected to the case, was not a proper decision, the sole reason of Detective Bilyeu's review of the protected document was to ensure that any privileged information of the defendant was properly screened off from the prosecution of the defendant. . . . While the more preferred cause [sic] of action would have been for the DPA to use a more neutral source for review like the courts, the conduct here does not rise to the level of egregiousness where prejudice should be presumed.

The first misinterpretation and misapplication of the law, as discussed in the previous section, is that the jurisprudence is clear that once privileged attorney-client communications are intercepted by a government actor like an investigating officer (Peña Fuentes), a corrections deputy (Irby), or a prosecutor, prejudice is presumed.  The presumption of prejudice is not triggered by a court's determination as to the "level of egregiousness" of the incursion into this constitutionally protected relationship.

- 17 -

No. 83588-2-I/18

The next misinterpretation of the law that occurred here is where the court weakly asserted that the decision to have another SCSO detective review the protected materials to determine whether they were privileged was "not a proper decision," and then failed to clearly state that such a decision by the government was not only inconsistent with the law but was also a further government interception of protected communications. Bilyeu's review of the privileged documents was yet another a violation of Myer's Sixth Amendment right to private communications with defense counsel.[11] Where concerns arise that a government actor may have come across privileged communications, the appropriate party to review the intercepted information is a neutral judicial officer who can employ additional protections for the accused such as in camera review.

There is little in the trial court's oral ruling to dissuade the SCSO or the prosecutor's office from repeating this conduct in the future, and it was utterly silent on the fact that each of those government entities lacks the authority to render such opinions without further violating the Sixth Amendment rights of the accused. The written FFCL are virtually silent on this aspect of the issue. The need for a clear ruling prohibiting such practices became abundantly apparent at oral argument before this court. When asked whether a detective was the proper party to make a determination as to what constitutes communication protected by attorney-client privilege, the State answered in the affirmative and further claimed

---

[11] At oral argument, the State ultimately conceded that Bilyeu's review of the privileged communications was itself a violation of Myers' Sixth Amendment right. Wash. Ct. of Appeals oral argument, State v. Myers, No. 83588-2-I (Apr. 25, 2023), at 12 min., 40 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023041313.

- 18 -

that "the court has approved of the use of what is colloquially referred to as a 'taint team' in other situations analogous to this."[12]  When the panel inquired into this practice of having a "taint team" of detectives review and determine whether documents contain privileged attorney-client information, the State said it was "not regular" but "it appeared to the [prosecutor's] office to be a permissible way to deal with an unknown document."[13]

While a "taint team" may be an appropriate way to approach other evidentiary issues that could arise in the investigation of a criminal case, this method fails to recognize, much less honor, the unique nature of this constitutionally protected relationship.  This is not a matter that can be sanitized by the same sort of screening as may be employed where one attorney in an office is conflicted off of a matter handled by a colleague.  The portion of the court's oral ruling that emphasized Bilyeu's role in this endeavor was "to ensure that any privileged information" was "properly screened off from the prosecution of the defendant" was simply incorrect.  The government's possession of protected communications, regardless of the role the individual actor has in the prosecution of the defendant, is itself the constitutional violation.  It is clear from the trial court's ruling and the State's argument before this panel that this impermissible practice has apparently become institutionalized to some extent and is found acceptable by the government attorneys in the local prosecutor's office.  This is despite the fact that all of the law enforcement officers who testified at the motion hearing

---

[12] Wash. Ct. of Appeals oral argument, supra, at 13 min., 15 sec.  It is unclear to which "court" the prosecutor was referring, the trial court or an appellate court.  Case law cited herein suggests it could not be the latter.

[13] Wash. Ct. of Appeals oral argument, supra, at 13 min., 40 sec.

indicated that they were aware that they should avoid contact with or otherwise intercepting privileged communications between an accused person and their attorney. Consequently, we must reiterate that in a criminal prosecution when a state actor may have obtained privileged attorney-client communications, the sole reviewer of those communications for purposes of making a definitive conclusion on that issue is to be a neutral judicial officer.

The manner by which the trial court here appears to have minimized the layers of governmental misconduct by the SCSO and DPA establishes that the court abused its discretion by misapprehending and misapplying the controlling authority. Proper review of the totality of the circumstances in order to select an appropriate remedy must necessarily include the following facts as established in the record, consistent with the court's credibility determinations which we leave undisturbed:

- Prior to Ryakhovskiy entering Myers' jail cell in search of handwritten documents, Saarinen had already obtained a jail kite with Myers' handwriting and a potential signature of his.

- Ryakhovskiy was trained on handling legal documents, yet proceeded to photograph 10 documents in Myers' cell on September 16, 2021 without regard for their possible contents.

- The same day, Ryakhovskiy disseminated those documents via e-mail to Saarinen, another government actor and the lead detective on Myers' case.

- 20 -

- Saarinen reviewed the documents with at least enough attention to read and recall certain words within them.

- On one of the documents, Saarinen saw the date written as "April 26," which she recognized that as the date of the alleged robbery.

- Saarinen deleted the images, and emptied her recycle bin on her computer, sometime contemporaneous to her communication with the DPA on Myers' case.

- DPA Scott called Saarinen and advised retention of the intercepted communication.

- Scott and Saarinen apparently agreed that the best course of action in light of the possible Sixth Amendment violation was to seize the documents and disseminate them to yet another government actor for review.

- This practice had become normalized to the extent that detectives who review potentially privileged communications are "colloquially referred to as a taint team."

- Saarinen communicated with Ryakhovskiy again, after advising Scott that nothing had been seized from Myers' cell previously, and directed him to now seize the original "handwriting samples" that he had photographed, excluding any that contained privileged information.[14]

---

[14] From a practical standpoint, it is unclear to this panel how Saarinen expected Ryakhovskiy to exclude items containing privileged information without first reading them, which would then be yet another violation of Myers' Sixth Amendment rights.

- 21 -

- When Ryakhovskiy returned to Myers' cell on September 16 and seized 5 documents therein, he believed that the documents containing "neat" handwriting on lined paper were likely privileged and left those documents in the cell—a standard he did not apply when he originally took pictures of the 10 documents and sent them to Saarinen.

- Bilyeu was directed by his supervisor, the sergeant of the major crimes unit, to contact Scott regarding involvement in the Myers case.

- Scott, an attorney representing the State, directed Bilyeu to review the documents seized from Myers' cell by Ryakhovskiy and "let the prosecutor's office, [Scott], know if there was anything in there that would be related to the attorney-client privilege."

- On September 20, Bilyeu retrieved the documents seized by Ryakhovskiy at Saarinen's direction and reviewed them in their entirety for the express purpose of identifying information protected by attorney-client privilege.

- Bilyeu concluded that 4 of the 5 documents seized from Myers' cell were privileged and "the State maybe shouldn't be in possession" of them, so he sought further instruction from DPA Scott.

- On September 21, DPA Scott finally notified Myers' attorney that the State had intercepted, and retained, documents suspected to contain privileged communications to her from her client and asked her to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

retrieve them from Bilyeu and confirm whether they were, in fact, privileged.

- Scott had concluded that he would seek in camera review by a judicial officer only after confirmation from defense counsel about whether the documents seized were protected communications.

Review of the transcript and FFCL issued after the hearing demonstrate that the court either failed to identify or properly consider many of these facts or failed to appropriately evaluate how they compounded both the government infringement on Myers' Sixth Amendment rights and the utter mishandling of the incident by almost every State actor involved.

This last issue is necessarily a part of the court's fashioning of an appropriate remedy, as the other stated purpose of the remedy in a case like this is expressly to deter the government from engaging in conduct known to violate the rights of the accused:

> if the investigating officers and the prosecution know that the most severe consequence which can follow from their violation of one of the most valuable rights of a defendant, is that they will have to try the case twice, it can hardly be supposed that they will be seriously deterred from indulging in this very simple and convenient method of obtaining evidence and knowledge of the defendant's trial strategy.

Cory, 62 Wn.2d at 377.  In State v. Garza, Division Three of this court recognized federal precedent and noted that a per se prejudice rule was adopted by the Tenth Circuit in cases such as these because that circuit concluded "'that no other standard can adequately deter this sort of misconduct.'"  99 Wn. App. 291, 299, 994 P.2d 868 (2000) (quoting Shillinger v. Haworth, 70 F.3d 1132, 1142 (10th Cir. 1995)).  While "dismissal is an extraordinary remedy" under CrR 8.3(b), it is one

that should be thoroughly and meaningfully considered, along with other options available to the court. Id. at 301-02.

In State v. Granacki, we reiterated the importance of deterrence in crafting an appropriate remedy. 90 Wn. App. 598, 959 P.2d 667 (1998). In that case, we affirmed the trial court's dismissal of two counts of robbery in the second degree, one count of attempted robbery in the second degree, one count of theft in the third degree, and one count of assault in the fourth degree based on the misconduct of the lead detective for the State. Id. at 599-600. During a brief recess at the beginning of trial, the court clerk witnessed the detective looking at the top page of defense counsel's legal pad that contained privileged attorney-client communications. Id. at 600. The clerk testified that she did not know how long the detective was looking at the documents, but she saw him looking at them for "several seconds." Id. The detective admitted to viewing the materials but asserted that he had only noticed and read his own name. Id. Even though the detective had not communicated to the prosecutor about what he had seen, prejudice was still presumed. Id. at 604.

On review, we explained that "any intrusion into a defendant's confidential communications with [their] attorney is sanctionable" and emphasized that "dismissal not only affords the defendant an adequate remedy" but it also serves the additional purpose of discouraging "'the odious practice of eavesdropping on privileged communication.'" Id. at 603 (quoting Cory, 62 Wn.2d at 378). We affirmed the dismissal and further noted that the following remedy would have also been appropriate under the circumstances: banning the detective from the

- 24 -

courtroom, excluding his testimony, <u>and</u> prohibiting him from discussing the case with anyone. <u>Id.</u> at 604.

In briefing, the State contends that the trial court "fashioned a remedy consistent with the discretion the <u>Granacki</u> court explicitly identified." We disagree. Here, the court's remedy, as set out in conclusion 5, was "suppression of any documents collected from the defendant's cell and [to] order that persons with knowledge of such documents do not share or disseminate the substance of [sic] contents of those documents." This ordering language does nothing more than affirm the existing state of the law with regard to the seized documents or information contained therein. The documents were already inadmissible, absent a waiver by Myers, precisely because they are privileged attorney-client communications, and ordering government actors to not disseminate information intercepted in violation of the Sixth Amendment is simply a command to follow rules by which they are already bound and, more critically, that they have already violated. This is no sanction at all on the government actors, who appear to have genuinely believed that their conduct was wholly appropriate, so there is no discouragement from engaging in similar behavior in the future.

The remedy here is woefully inadequate and further demonstrates that the trial court did not apply the standard set out in <u>Irby</u>, wherein we set out a non-exhaustive list of other remedies short of a dismissal, which were likely to further the other goal of deterring future government misconduct:

> If called on to fashion a remedy on remand, the trial court should consider the totality of the circumstances, evaluating both the degree of prejudice to [the accused's] right to a fair trial and the degree of nefariousness of the conduct by the state actors. This

- 25 -

> might include considering the motivations of the jail guards . . . and the extent to which, if at all, [the accused's] privileged attorney-client communications were utilized by the State in its . . . prosecution of [the accused] or could be so utilized in the future.
>
> In the event that the trial court determines that a remedy short of dismissal is warranted, vacation of the judgment will nevertheless be necessary. In addition, in anticipation of yet another trial, other remedies might include—singularly or in combination—suppression of evidence, disqualification of specific attorneys from [the accused's] prosecution, disqualification of the . . . County Prosecuting Attorney's Office from further participation in this case, or exclusion of witnesses tainted by the governmental misconduct.

3 Wn. App. 2d at 264-65. In fashioning an appropriate remedy under CrR 8.3(b), the court must necessarily look beyond whether the DPA reviewed the privileged material, but rather to the broader impact of the government intrusion into a protected relationship, how that constitutional violation may have deprived Myers of his right to a fair trial, and how to disincentivize such governmental violations going forward.

We reverse the denial of the CrR 8.3(b) motion to dismiss and remand for the court to apply the proper standard established by controlling case law. If the court determines that dismissal is proper, that necessarily terminates the case. Pursuant to Irby, even if "the trial court determines that a remedy short of dismissal is warranted, vacation of the judgment will nevertheless be necessary." Id. This is because anything that is short of dismissal, but goes beyond the ineffective suppression previously ordered, will require the State to decide whether it will retry Myers under those new remedial constraints (i.e., "disqualification of specific attorneys . . ., disqualification of the . . . County Prosecuting Attorney's Office from further participation in this case, or exclusion of witnesses tainted by the governmental misconduct."). Id. On remand, the trial court must determine

No. 83588-2-I/27

whether to grant the CrR 8.3(b) motion to dismiss, or to impose some lesser remedy that goes beyond mere suppression of already inadmissible material, by conducting a proper inquiry under Irby and considering the totality of the circumstances as established by the testimony of the various government actors.[15]

Reversed and remanded.

Hazelrigg, A.C.J.

WE CONCUR:

Coburn, J.

Chung, J.

---

[15] Because Irby establishes that this reversal vacates the judgment and sentence, we decline to reach Myers' remaining assignment of error regarding jury selection.

- 27 -