# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>TERRANCE JON IRBY,<br><br>Appellant. | No. 83018-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — Terrance Irby appeals convictions for first degree murder and first degree burglary in connection with a 2005 homicide. While Irby was awaiting trial in the Skagit County Jail in 2016, "his confidential attorney client communications were inappropriately opened, viewed, and time stamped by Skagit County jail staff members." Irby sought dismissal due to governmental misconduct under CrR 8.3(b), but the superior court denied dismissal and Irby was subsequently convicted. We remanded for a new hearing on Irby's CrR 8.3 motion. The superior court found the State did not meet its burden to show Irby was not prejudiced by the interception of his attorney-client communications and vacated Irby's conviction, but ruled the prejudice did not "rise to a level that requires dismissal," and ordered only a new trial. Irby was convicted again. Irby presents one issue on appeal: "whether merely ordering another trial can sufficiently remedy these violations." We hold that ordering a new trial remedied the State's violations and affirm.

I

A

The State charged Irby with murder in connection with the 2005 death of James Rock. Irby was convicted in 2007, but the conviction was reversed because a portion of jury selection occurred in his absence. State v. Irby, 170 Wn.2d 874, 877, 879, 246 P.3d 796 (2011) (Irby I). Irby chose not to attend his second trial in 2013, saying he could not receive a fair trial in the county. State v. Irby, 187 Wn. App. 183, 189, 347 P.3d 1103 (2015) (Irby II). Irby was convicted and appealed. Id. We described the State's evidence as follows:

> On March 11, 2005, an officer was dispatched to check on James Rock at his residence in rural Skagit County. Rock had not shown up for a scheduled ride provided by a transportation service for the elderly. Rock's body was found in his shop, a large metal garage-type structure set apart from his house by a breezeway. He had been beaten to death several days earlier with a variety of blunt and sharp weapons. Detectives called to the scene found that Rock's bedroom door had been forced open. Several weapons he kept there were missing.
>
> Investigation led to Terrance Irby, a known associate of Rock. Rock's neighbors had seen Irby in the neighborhood on March 8. Irby was soon located in custody in Marysville. He had been arrested there on March 8, after running a red light and attempting to elude police. In Irby's truck, officers found Rock's weapons and boots splashed with Rock's blood.

Id. at 188-89. We reversed Irby's second conviction because a juror had demonstrated bias during jury selection such that seating the juror was manifest constitutional error. Id. at 197. We also concluded there was insufficient evidence to establish aggravating circumstances justifying a charge of aggravated first degree murder, insufficient evidence to establish felony murder, and insufficient

evidence to establish a strike offense relied on to sentence Irby as a persistent offender. Id. at 202-04, 208.

In advance of Irby's third trial in 2016, attorney Jennifer Rancourt appeared on behalf of Irby. Rancourt represented Irby from March 9, 2016, through to a hearing on April 15, 2016, when Irby filed a motion to terminate Rancourt's representation and proceed pro se. In a June 2016 hearing, Irby asserted misconduct by jail guards, claiming they had improperly opened communications he had addressed to Rancourt. On July 14, 2016, Irby filed a pro se motion to dismiss all charges under CrR 8.3(b), claiming 12 of 14 "kites" intended for Rancourt were read and stamped by jail staff. A "kite" is a multipurpose request form available to inmates in the Skagit County Jail. State v. Irby, 3 Wn. App. 2d 247, 255, 415 P.3d 611 (2018) (Irby III). Irby argued these actions violated his right to counsel and right to confidential communications.

According to Irby's 2016 filings in support of dismissal, between March 23, 2016 and April 4, 2016, Irby sent 10 confidential communications to Rancourt. Nine were stamped and initialed by county jail staff. In these communications, Irby expressed frustration with Rancourt about her representation, her failure to file the motions he wanted filed, and her failure to respond to his communications. Irby expressed his thoughts on one of his former attorney's discovery efforts, a juror's appearance at a previous sentencing hearing, a possible motive for Rock's murder, possible DNA (deoxyribonucleic acid) cross-contamination by crime lab scientist Greg Frank, and concerns under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

The superior court denied Irby's motion to dismiss, ruling the jail had violated his rights, but he had not shown prejudice. Irby III, 3 Wn. App. 2d at 251-52. Irby chose not to participate in his third trial in 2016 and was convicted. Id. at 252. On appeal, we concluded the court erred by not imposing a presumption of prejudice arising from the interception of Irby's attorney-client communications and requiring the State to prove the absence of prejudice beyond a reasonable doubt. Id. at 262-63. We remanded, directing the superior court to "marshal all of the evidence and determine whether the State's evidence has overcome the presumption of prejudice and established the absence of prejudice beyond a reasonable doubt." Id. at 263. We directed that if the State failed to meet this burden, the superior court would be required to fashion a remedy. Id. at 264. We directed that if the court concluded a remedy would be required short of dismissal, it would nevertheless be necessary to vacate the judgment. Id. at 264-65. This court issued its mandate on May 25, 2018.

B

The superior court conducted an evidentiary hearing over four days in November and December 2018.[1] Rancourt recalled that on at least one occasion, she delivered something to the jail for Irby but he did not receive it, which caused "a great deal of friction." Rancourt estimated she received probably more than 25 kites from Irby during her representation of him. On April 15, 2016, Irby accused Rancourt of lying to him for two weeks because she said she did not receive the

---

[1] The Whatcom County Prosecutor's office represented the State at the evidentiary hearing.

kites Irby sent to her through the jail. Irby's subsequent counsel later reviewed Irby's file with Rancourt's office and reported no letters in the file from Irby to Rancourt "that are the subject of this hearing."

Sergeant Ronald Coakley testified that through his assignment with the Skagit County Sheriff's Office's Corrections Division, he oversaw administrative duties, work programs, and community programs. Deputy prosecuting attorney Erik Pedersen sent Coakley copies of Irby's 2016 kites in 2018 for Coakley to try and identify the corrections deputies who initialed the kites. Coakley believed some of those kites had been initialed by six different current and former deputies. Coakley was not able match the initials for all of the kites.

Coakley testified Irby's kites were stamped by the jail to track them and ensure they were being dealt with in a timely manner. Inmate kites, both in 2016 and at the time of Coakley's testimony, would not remain confidential. When shown exhibit 2 that was labeled " 'Attorney box, Rancourt,' " Coakley testified the kites were opened because that was the way the jail staff "felt was the best way to deal with it, I suppose." Although kites were not treated as confidential, inmates had the option to address confidential communications to attorneys in sealed envelopes. Irby contended Rancourt did not supply sufficient quantities of envelopes for this purpose. From among the six deputies Coakley identified as having initialed kites that Irby had identified, the State called four. Corporal Teresa Dorcy agreed her initials were on exhibit 4, but did not recall reading it. Deputy Michael Warner testified his initials and identification number were on exhibit 2. Deputy Mark Rinas believed his initials were on exhibit 1. Deputy David Anderson

recognized his initials on the kite marked as exhibit 8. None of these witnesses testified they read any of Irby's communications, but their testimony varied as to the handling of kites such that no party challenges on appeal the trial court's finding that "Due to the inconsistent handling of [Irby's] kites, his confidential attorney client communications were inappropriately opened, viewed, and time stamped by Skagit County jail staff members."

The jail guards who testified at the hearing indicated they did not convey Irby's communications to either the investigative side of the sheriff's department or to prosecutors. Coakley testified he did not recall contacting anyone from the prosecutor's office or sheriff's office's investigative branch to discuss the contents of Irby's kites before September 2016. Dorcy testified she did not recall contacting anyone from either the prosecutor's office or sheriff's office's investigative branch about Irby's case. Warner and Anderson both did not recall talking to anyone in 2016 at the sheriff's office or prosecutor's office about Irby. Rinas denied contacting anyone at the prosecutor's office or sheriff's office's investigative branch to discuss Irby. Another jail guard, Aaron McIntosh, testified he could not recall if anyone from the prosecutor's office asked him about a time when McIntosh lost or misplaced Irby's documents. Despite this testimony, Warner admitted there have been occasions when someone else collected the kite and he stamped it. And Rinas conceded it was possible someone else opened exhibit 1, and it may have been sitting around until he stamped it. The testimony of these jail guards thus could not eliminate the possibility that other guards could have forwarded content from Irby's communications.

The State called two witnesses from the sheriff's department who were responsible for investigating Irby, had testified at trial previously, and would go on to testify at the trial under review. Skagit County Detective Kay Walker testified she became involved in Irby's case from the initial investigation and was the lead detective at the time of the hearing. At some point in 2016, Walker became aware jail staff intercepted Irby's communications meant for Irby's attorney. No deputy from the sheriff's office ever delivered any of those communications to Walker. Walker did not have an opportunity to review any of Irby's kites meant for his attorney. At no point in the investigation did Walker ever encounter kites Irby addressed to one of his own attorneys. A letter from Irby was found in the file of another detective, Jennifer Sheahan-Lee, but it did not have anything to do with Irby's attorneys. Walker testified at Irby's 2013 and 2016 trials, but Walker testified at the hearing that she did not present a new theory of the case, testify about new information, or have new evidence in 2016 that she did not have in 2013.

Detective Sergeant Sheahan-Lee worked as the lead detective on Irby's case from 2005 to 2008. She testified that after she left the investigation unit in 2008, Walker took over the case. She testified that in 2016, she was preparing to go back to trial and "[m]ore in a holding pattern," rather than pursuing new investigation. Irby's case had been investigated "pretty thoroughly" before, and in 2016 they were just preparing for trial, unless they were advised of some new information that needed to be followed up on. Sheahan-Lee was told of a concern that jail staff were potentially opening some legal mail. No one from the sheriff's office brought Sheahan-Lee any information that appeared to be from Irby's kites

7

to his attorneys. She did not recall having any discussions with any of the jail deputies or prosecutor's office concerning the contents of Irby's communications to his attorney. At Irby's 2016 trial, Sheahan-Lee testified about her analysis of Rock's phone, information from the internet regarding what was found on Rock's phone, and a spreadsheet she created regarding those materials. Sheahan-Lee's lab submission at the 2016 trial contained a list of items sent to the lab for evaluation: keys, hiking boots, a black leather jacket, blood swabs, a DNA blood stain card, and buccal swabs.

By calling only Walker and Sheahan-Lee, the State did not call all of the sheriff's department investigators assigned to Irby's case nor all of those who would go on to testify at his fourth trial. Walker testified Detectives Sheahan-Lee, Theresa Luvera, Ken Tiscornia, and Deputies Johnny Rose, Craig Mullen, and Terry Esskew all worked on Irby's case. Walker admitted she would not know if someone spoke to her about the substance of Irby's confidential kites if she was not told the source of the information.

Last, the State called five witnesses from the prosecuting attorney's office, all of whom testified they had no knowledge of receiving Irby's confidential communications. Pedersen testified he took over Irby's prosecution following Irby's first appeal. Pedersen first became aware that corrections deputies had intercepted some communications that Irby had written to his attorney in July 2016 after Irby served pleadings concerning those interceptions. Before Pedersen saw those pleadings, nobody from the jail had contacted him to tell him about Irby's kites. When Pedersen received the pleadings, Pedersen testified, he read only

the first page, which said John Oslund, Irby's former attorney, went to Moses Lake. Pedersen stopped reading and made copies for an upcoming hearing because he noticed Irby had not filed the pleadings with the court. Before Irby's 2016 trial, Pedersen did not choose to read any of the contents of what Irby submitted. The trial court asked Pedersen if the contents of one of Irby's communications to Rancourt, exhibit 13, would change his strategy if he were to retry the case, to which Pedersen replied "no." Pedersen first read Irby's communications meant for his attorney at least six months after Irby's 2016 trial. Pedersen followed up with McIntosh about one of Irby's lost documents, but they were not able to find it. Pedersen did not believe anybody from his office had copies of Irby's kites submitted as pleadings. Pedersen did not believe the presentation of the DNA evidence, or any other evidence, changed between the 2013 and 2016 trials.

Irby argued the State failed to produce "new evidence obtained in May 2016 and June 2016" that an analysis of two crime lab analysts, Frank and Brian Smelser, found "gross discrepancies and gross cross-contamination during DNA testing procedures," and "[t]he affected testing was conducted during the same timeframe" as the evidence tested in Irby's case. Irby claimed the State's unwillingness to produce this information despite requests from Irby to the State, the crime lab, and the prosecutor's office constituted a Brady violation, presumably because of its potential impeachment value against Frank. Irby sought to establish that evidence of testing errors by Frank emerged after Irby mentioned them in a communication to Rancourt dated March 23, 2016 and before the hearing on his motion to dismiss in August 2016, implying the State had become alerted to his

9

strategy by intercepting his attorney-client communications. Other information discredited this theory. Irby filed his motion to proceed pro se on March 30, 2016, and he referred in this public filing to evidence of testing errors by Frank. Pedersen testified he had long since heard about and was aware of Irby's opinions on Frank. Without agreeing any of the information concerning Frank's testing was Brady material, Pedersen testified Irby made a public disclosure request to Frank and Frank provided responsive information to Pedersen as well as to Irby. Pedersen testified he gave Irby information that would have allowed Irby to address DNA cross-contamination. Pedersen testified he did not have any information impugning the DNA testing process, and nothing indicated contamination of the DNA tests in Irby's case. Walker denied being aware there was any Brady material on DNA analyst Frank for the 2016 trial, and Sheahan-Lee did not know about Brady material on Frank.

Irby also challenged Pedersen on his failure to offer in evidence a piece of physical evidence from the crime scene. A card found at the crime scene contained a mixture of two individuals, one of whom was Rock, and Irby was excluded as a possibility for the second individual. Pedersen did not offer this card in Irby's second or third trial, because the State had "no explanation of how the item got on the sample, the DNA got on the sample."

Rosemary Kaholokula was Skagit County's chief criminal deputy prosecutor in April 2016. Kaholokula supervised Pedersen while Pedersen worked on Irby's case. Pedersen told Kaholokula about the issue with the jail staff, but Kaholokula did not believe she had ever reviewed the kites Irby had written to his attorney.

Mary Ryan was a Skagit County deputy prosecutor in March and April 2016 who second chaired Irby's third trial alongside Pedersen. Ryan did not receive or review any copies of kites Irby had written to his attorney. Neither Pedersen nor any sheriff's deputies spoke with Ryan about the subject matters of Irby's kites. When asked whether there was any new evidence presented in the 2016 retrial that had not been presented previously, Ryan testified, "No. Not to my knowledge."

The State called prosecutor's office legal assistants Karen Wallace and Judy Ross. Wallace's responsibilities included giving Pedersen any incoming documents received and generating pleadings for him. Wallace did not recall the county jail sending any kites from Irby to his attorney, and those kites would have come through her if Pedersen received them. Wallace agreed that Pedersen did some of his own filing, and if he did she would not see those documents or know of them unless he told her about them. Ross recalled taking documents Pedersen produced to the jail to have them stamped in and to bring the stamped copy back. In that timeframe, Ross did not recall receiving any information from the jail that related to Irby.

The superior court found the jail had no consistent policy on how inmate kites were handled during Irby's incarceration there in 2016, that lack of policy led to Irby's confidential attorney client communications being inappropriately opened, viewed, and time stamped by jail staff, and it was unclear whether Irby's kites containing these confidential communications were delivered to his attorney. The court found these actions by the jail staff destroyed Irby's relationship with his attorney. But the court made further findings that Irby now challenges, to the effect

11

that the jail's interception of Irby's attorney-client communications did not result in information being shared with the prosecution:

7. The Skagit County Jail did not intentionally confiscate kites, read kites, or pass on information contained in kites within the jail, or to the investigative side of the Sheriff's Office, or to the Prosecutor's Office.

8. The Skagit County Jail did not provide any information contained within the Defendant's confidential attorney client kites to any person at the Skagit County Prosecutor's Office.

9. The Skagit County Jail did not provide any information contained within the Defendant's confidential attorney client kites to any of the investigators assigned to the Defendant's case by the Skagit County Sheriff's Office.

The court did not dismiss the charges. Instead, the court ordered a new trial based on the following conclusions of law that Irby challenges on appeal:

1. The governmental misconduct of opening, stamping, and viewing the Defendant's confidential attorney client kites did not produce any evidence that was used in Defendant's trial in September of 2016.

2. The governmental misconduct of opening, stamping, and viewing the Defendant's confidential attorney client kites was not used to assist the government in thwarting the Defendant's trial strategies in September of 2016.

. . . .

4. The governmental misconduct of opening, stamping, and viewing the Defendant's confidential attorney client kites did not give the State an unfair advantage at trial in September of 2016.

5. The State has not overcome its burden regarding the Defendant's loss of confidence in his attorney, *See conclusion of law No. 3,* but this prejudice does not rise to a level that requires dismissal; vacation of the previous judgements and a new trial is a sufficient remedy to purge the taint presented by the government's misconduct.

The court vacated Irby's convictions and ordered a new trial after considering "the totality of the circumstances," because "the destruction of Defendant's confidence in his attorney prevented the Defendant from having the assistance of an attorney at trial."

In its oral ruling, the court addressed Irby's argument that the State could not disprove prejudice because at the evidentiary hearing it did not call all of the detectives who participated in gathering evidence supporting the charges and who were witnesses against Irby. The court acknowledged the State failed to call some witnesses who testified at trial and may have been exposed to Irby's confidential communications, but would "be happy to conduct pretrial testimonial hearings" at the new trial to ask those witnesses about their knowledge before they would be allowed to testify.[2]

II

Irby's fourth trial was held in 2021. Irby represented himself and waived his presence at trial. Among the 20 witnesses called at trial, four were Skagit County law enforcement officers whom the State did not present at the evidentiary hearing. These witnesses were Mullen, retired Chief Deputy Will Reicherdt, Esskew, and Tiscornia. Neither the State nor Irby (who was not participating) sought to examine any witnesses before they testified as the court had offered at the evidentiary hearing.

---

[2] The superior court also ruled it would not disqualify the Skagit County prosecutor's office or sheriff's office personnel from participating in Irby's retrial. Irby does not challenge these rulings on appeal.

Mullen testified that while on patrol duty on March 11, 2005, he responded to a welfare check call for Rock. Mullen approached the residence, received no answer after knocking on the door, and received no answer after walking around the residence and looking into and knocking on the windows. He observed a detached garage fairly close to the residence. Mullen entered the garage and found Rock's body. Mullen contacted his sergeant, who directed him to take photographs of everything and check the residence while detectives and other deputies were en route. Mullen swept the house and began taking photographs. These photographs were admitted and published to the jury. Law enforcement personnel began arriving, including Tiscornia. The officers were not able to locate any firearm at the scene, and Mullen returned the next day to assist in the search for a possible murder weapon, which also proved unsuccessful.

Reicherdt testified he received a phone call from Tiscornia who asked Reicherdt to respond to a possible homicide crime scene. Reicherdt responded to the scene and after observing Rock's body in the garage, called Daniel Selove, MD to examine the body. Dr. Selove's observations of Rock's multiple blunt force trauma wounds to the head led Reicherdt to begin a homicide investigation. Rock's body was removed from the garage, and the crime scene was secured overnight. The following morning, Rock's body was scheduled for an autopsy and the investigation began. Reicherdt met with five detectives, including Tiscornia and Esskew, to delegate duties to the detectives. Reicherdt assigned Tiscornia to attend the autopsy with Dr. Selove and assigned Esskew to assist collecting and processing evidence at the scene. Reicherdt testified the group looked at both the

14

garage and residence "pretty thoroughly." Reicherdt drove a van with the collected evidence back to the sheriff's office, where it was unloaded and secured in the evidence room. The investigation team developed a suspect and Tiscornia obtained search warrants. Reicherdt assigned Sheahan-Lee to serve as the case's primary investigator. Over the next several weeks, Reicherdt and Sheahan-Lee spoke daily about the case.

Esskew testified his primary duty at the scene was to document the area, scene, residence, and outbuildings with a camera. Esskew described several photographs he took of the residence, which were admitted into evidence. He assisted two other detectives in documenting the area inside and around the garage, which included taking more photographs. Esskew testified he wore protective gloves and foot coverings while documenting and collecting evidence so as not to contaminate the scene.

Tiscornia testified that when he arrived at the scene, only Mullen and another sheriff's deputy were present. Using a flashlight and protective gear, Tiscornia began investigating the inside of the garage. He took several pictures as he worked his way through the garage's interior and observed several stains consistent with blood. When he reached Rock's body, Tiscornia noticed a large pool of blood under Rock's head. After Dr. Selove arrived at the scene and observed Rock's body, he informed Tiscornia that Rock sustained significant back, left-side, blunt force trauma from multiple blows. Rock had a deep slash wound near his jugular vein on the right side and a gaping wound that was the source of the majority of the blood. Rock's body was taken for the coroner to conduct an

15

autopsy, which Tiscornia attended. During the autopsy, Tiscornia collected trace evidence, assisted the doctor with scraping and clipping Rock's fingernails, looked for foreign substances on Rock's body and clothes, and collected the contents of Rock's pockets. After the autopsy, Tiscornia collected the clothing, contents of Rock's pockets, and other items before bagging them and transporting them to the sheriff's office. Tiscornia returned to the scene to assist the other investigators and document the several stains he observed when he first entered the garage. Tiscornia testified about the distance of the blood spatters on the garage's interior walls to Rock's body. Following Irby's arrest by the Marysville Police Department, officers seized several items from Irby's vehicle including firearms. Tiscornia retrieved those firearms from the Marysville Police Department. Tiscornia participated in the search of Irby's vehicle. He was present for the vehicle's initial opening, moved some items around the inside of the vehicle, and prepared the vehicle for examination by the crime laboratory by removing some personal property.

The State called 16 other witnesses, and the trial court admitted dozens of the State's exhibits into evidence. A jury found Irby guilty of first degree murder and first degree burglary.

III

Irby argues the superior court abused its discretion by ordering a new trial instead of dismissing the charges against him. We disagree.

Under CrR 8.3(b), the court, "in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or

16

governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Governmental misconduct need not be evil or dishonest in nature; simple mismanagement is sufficient. State v. Blackwell, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993). Dismissal is an extraordinary remedy to which the court should resort only in " 'truly egregious cases of mismanagement or misconduct.' " State v. Wilson, 149 Wn.2d 1, 9, 65 P.3d 657 (2003) (quoting State v. Duggins, 68 Wn. App. 396, 401, 844 P.2d 441, aff'd, 121 Wn.2d 524, 852 P.2d 294 (1993)). However, dismissal is a remedy that should be thoroughly and meaningfully considered, along with other options available to the court. State v. Myers, __ Wn. App. 2d __, 533 P.3d 451, 464 (2023). A trial court's decision on a motion to dismiss is reviewed for abuse of discretion. State v. Brooks, 149 Wn. App. 373, 384, 203 P.3d 397 (2009). A trial court abuses its discretion when its decision is manifestly unreasonable, when it exercises its decision on untenable grounds, or when it makes its decision for untenable reasons. Id.

A

Our remand directed that, if the trial court found a violation because the State failed to rebut the presumption of prejudice, then it must fashion a remedy based on consideration of "the totality of the circumstances." Irby III, 3 Wn. App. 2d at 264. We explained, "CrR 8.3(b) grants the trial court discretion to 'fashion an appropriate remedy, recognizing that dismissal is an extraordinary remedy, appropriate only when other, less severe sanctions will be ineffective.' " Id. (quoting State v. Garza, 99 Wn. App. 291, 301-02, 994 P.2d 868 (2000)).

17

In State v. Peña Fuentes, the court held that the presumption of prejudice from eavesdropping may be rebutted. 179 Wn.2d 808, 819, 318 P.3d 257 (2014). The court explained it did not believe dismissal is required if there is "no possibility of prejudice." Id. The court cited United States Supreme Court precedent to explain that if the government's misconduct does not "create 'at least a realistic possibility of injury to [the defendant] or benefit to the State,' " then " 'there can be no Sixth Amendment violation.' " Id. at 819 (alteration in original) (quoting Weatherford v. Bursey, 429 U.S. 545, 557-58, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977)). Peña Fuentes did not address the situation that Irby III anticipated, that the presumption of prejudice might not be fully rebutted, yet a remedy short of dismissal could suffice.[3] Here, prejudice was not fully disproved. Case law nevertheless contemplates that courts will assess the nature of the prejudice in fashioning a remedy. Where a conclusion of prejudice flows from the State's failure to rebut the presumption that it occurred, the focus should be on redressing any " 'realistic possibility' " of prejudice remaining unrebutted. Id. at 819 (quoting Weatherford, 429 U.S. at 557-58).

United States v. Morrison observed that the court had never assumed that dismissal was the only appropriate remedy for a violation of the Sixth Amendment right to counsel. 449 U.S. 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981). The

---

[3] In light of the superior court's finding that because of the State's violations Irby was prejudiced, which neither party questions on appeal, this case does not present those "rare circumstances" where there is "no possibility of prejudice." Peña Fuentes, 179 Wn.2d at 819. Cf. Irby III, 3 Wn. App. 2d at 253 n.3 (in cases where "no prejudice to the defendant arose from the infringement, a defendant has not been deprived of a Sixth Amendment right and no remedy need be applied.").

18

court acknowledged, "without detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice." Id. The court held, "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." Id. (citing Gideon v. Wainwright, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (ordering a new trial)).

Morrison noted eavesdropping cases in which "law enforcement officers improperly overheard pretrial conversations between a defendant and his lawyer," for which the remedy ordered was a new trial. Id. at 364-65. Morrison cited Black v. United States, 385 U.S. 26, 27, 87 S. Ct. 190, 17 L. Ed. 2d 26 (1966), in which the government admitted that through the use of a listening device placed in the defendant's hotel room in a separate investigation, government agents overheard " 'exchanges between petitioner and the attorney who was then representing him (Black)' in this case." The government further admitted that "reports and memoranda of the intercepted conversations were examined by the Tax Division attorneys and retained by them until April 15, 1964, when petitioner's trial began." Id. at 28. The court ordered "a new trial" so as to "afford the petitioner an opportunity to protect himself from the use of evidence that might be otherwise inadmissible." Id. at 28-29.

Washington decisions are consistent with these holdings. In State v. Cory, 62 Wn.2d 371, 382 P.2d 1019 (1963), there was both a high degree of

nefariousness and significant risk of prejudice. State actors had purposefully targeted the defendant's consultations with counsel. The jail provided a room "for consultations between prisoners and their attorneys." 62 Wn.2d at 372. State actors installed a listening device in the same room, listened to the defendant's consultations with counsel, and made recordings of the conversations. Id. The conversations occurred while the defendant, unable to post bail, "remained in the county jail from the time of his arrest throughout the trial and thereafter." Id. That the government's design was to listen to consultations with counsel informs the court's observation that there was "no way to isolate the prejudice resulting from an eavesdropping activity, such as this," id. at 377, as well as its decision to assume information was transmitted to the prosecutor, id. at 377 n.3. The Supreme Court ordered dismissal based on this "shocking and unpardonable conduct." Id. at 378. A new trial is not an adequate remedy when it would permit the government to benefit from its misconduct. See id. at 377. State v. Granacki involved similarly intentional misconduct. 90 Wn. App. 598, 601, 959 P.2d 667 (1998). During a recess in trial, a detective looked at defense counsel's legal pad, which contained privileged communications and trial strategies. Id. at 600. We held it was not an abuse of discretion for the trial court to dismiss the charges. Id. at 604. While the detective did not communicate what he saw to the prosecutor, the information he read may have affected his testimony. Id.

While Cory and Granacki involved intentional eavesdropping, other Washington decisions have, like Black, involved the government encountering attorney-client communications while attempting to investigate another aspect of

the same matter or a different matter concerning the defendant. In Peña Fuentes, after the defendant had been convicted and with a motion for a new trial pending, the defendant filed evidence that a witness had recanted trial testimony. 179 Wn.2d at 815-16. The prosecutor asked a detective to listen to the defendant's jail phone calls to investigate potential witness tampering, and the detective did so, listening to six conversations Peña Fuentes had with defense counsel. Id. at 816. On learning the detective had listened to these calls, the prosecutor disclosed the breach and took steps to sequester the improperly learned information. Id. at 817. In Myers, desirous of obtaining handwriting samples to implicate the defendant, detectives requested jail guards search the defendant's cell and seize handwritten materials, many of which proved to be attorney-client communications. 533 P.3d at 455. And in Garza, in an effort to investigate a possible escape attempt, "jail officers seized, examined, and perhaps even read the defendants' legal materials (including private attorney-client communications)." 99 Wn. App. at 293, 296. Peña Fuentes, Myers, and Garza involved intentional review by the State of the defendants' attorney-client communications, but none involved, like Cory, misconduct designed to accomplish that particularly.

These decisions remanded for the trial courts to apply the correct standard to determine whether the presumption of prejudice was rebutted. Peña Fuentes, 179 Wn.2d at 822; Myers, 533 P.3d at 465; Garza, 99 Wn. App. at 301. But none ordered dismissal as Cory did, and none were cases in which the trial court had determined dismissal was justified, as in Granacki. Myers explained the inquiry goes "beyond whether the [prosecutor] reviewed the privileged material," and

21

extends to "the broader impact of the government intrusion into a protected relationship, how that constitutional violation may have deprived [the defendant] of . . . a fair trial, and how to disincentivize such governmental violations going forward." 533 P.3d at 465. This frames our inquiry: we must determine whether the trial court had a tenable basis to conclude its remedy would redress the realistic possibilities of prejudice to Irby's rights remaining unrebutted by the State after the evidentiary hearing, and adequately disincentivize similar violations in the future.

B

Irby argues the evidence at the hearing did not support that jail staff did not intentionally intercept Irby's communications and convey their content to the investigating detectives and prosecuting attorneys, as a result of which, Irby says, findings of fact 7, 8, and 9 are unsupported by substantial evidence. Irby notes the State called only six out of 41 jail guards who worked shifts during the period in which Irby submitted the kites known to be opened. Likewise, he says, the State did not call investigating detectives at the hearing despite calling them as witnesses later at trial and did not call all the prosecutorial staff at the hearing who participated in trial. As a result, Irby reasons, it is impossible to know the intent of many jail guards who were in a position to open and read some of his kites, and impossible to know whether a jail guard who did not testify at the hearing could have conveyed information to a detective who did not testify at the hearing but then testified at trial. Because "significant unanswered questions" remained, Irby argues, the trial court's relief was inadequate.

The State's decision not to call many of the witnesses is significant. In Irby III, we held the declaration of Pedersen on which the State then relied was insufficient to "eliminate the possibility that Irby's right to a fair trial was prejudiced," because it did not "identify whether there were any other investigators . . . who might have communicated with the jail guards and gleaned privileged attorney-client information from the jail guards' misconduct." 3 Wn. App. 2d at 261-62. We explained the significance of the omission:

> Indeed, if other investigators participated in Irby's prosecution, the State's declaration does not address whether those investigators had, unbeknown to the lead detective and prosecutor, obtained information derived from the jail deputies' misconduct, used that information in their investigation of Irby, and/or forwarded those investigative materials to the lead detective or to the prosecutors.

Id. We observed the same problem had been present in Peña Fuentes, in which the State's evidence "did not address the possibility that the prosecutor had wittingly pursued the case in reliance on information obtained by the lead detective 'as part of an investigation aided by the eavesdropping.' " Irby III, 3 Wn. App. 2d at 260 (quoting Peña Fuentes, 179 Wn.2d at 822). On remand here, the State chose still not to call several investigators to testify at the hearing.

We nevertheless conclude the evidence was sufficient to support the trial court's findings because it eliminated any " 'realistic possibility' " of prejudice to Irby's rights other than to the extent the trial court found. Peña Fuentes, 179 Wn.2d at 819 (quoting Weatherford, 429 U.S. at 557-58). We review findings of fact for substantial evidence. State v. Hatt, 11 Wn. App. 2d 113, 127, 452 P.3d 577 (2019). " 'Substantial evidence exists where there is a sufficient quantity of evidence in the

23

record to persuade a fair-minded, rational person of the truth of the finding.' " State v. Delbosque, 195 Wn.2d 106, 116, 456 P.3d 806 (2020) (quoting State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)). Circumstantial evidence and direct evidence are equally reliable. State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). A trial court making findings in a criminal case is entitled to rely on reasonable inferences from the evidence. See State v. Bennett, 6 Wn.2d 208, 212, 107 P.2d 344 (1940) ("A criminal case, like any other, may be proved by circumstantial evidence, and reasonable inferences have the same probative effect as direct testimony."); State v. Trasvina, 16 Wn. App. 519, 525, 557 P.2d 368 (1976) (sufficiency of the evidence to support conviction). Our conclusion follows from the evidence the State presented and the reasonable inferences it supported.

Regarding lack of intent by the jail staff, the guards who testified supported the trial court's findings that the jail handled Irby's communications carelessly, but their testimony did not show a design to read attorney-client communications. Their testimony conceded that kites were opened, because they did not view them as confidential. At the same time, their testimony did not indicate interest in the content of the kites beyond directing them to their intended recipient. Further supporting the lack of intentional review of attorney-client communications was the testimony of the guards that they did not convey any communications to the investigating officers or prosecuting attorneys.

The same testimony provided some support for the findings that other jail staff who did not testify at the evidentiary hearing did not convey information to the

investigative side of the sheriff's office or to the prosecutor's office. The guards' testimony showed that as a matter of routine those guards opened and observed the face of Irby's communications, but those guards' routines did not extend to any of them reading or remembering any communications. This supports the inference that there was not a plan at the jail to intercept private communications, and that there likewise was not a scheme to convey information from the jail kites to detectives or the prosecuting attorneys. This is the opposite of <u>Cory</u>, in which the jail guards' purposeful efforts to overhear attorney-client consultations suggested the intent to use the information they had worked methodically to obtain.

The investigators and prosecution staff who testified also provided some support for the trial court's findings that no information was conveyed. Those who testified indicated they had no knowledge of receiving any of Irby's confidential information. This supports an inference that the prosecution did not benefit from any such information at Irby's fourth trial. Those primarily responsible for presenting the case against Irby would be familiar with the extent of the available evidence and its sources. They would understand the main reasons why the evidence showed Irby was guilty and the provenance of that evidence. If significant aspects of their proof had derived from Irby's communications to Rancourt in 2016, they would have some inkling that an aspect of their case had newly emerged more than a decade after the homicide. They expressed none.

The timing of the investigation supports the trial court's findings. The detectives testified at the evidentiary hearing that they were not developing new evidence against Irby in 2016 and their intentions for trying the case for the third

25

time followed the same general outline they had presented at Irby's first and second trials, based on the evidence they had developed in the original investigation, years before Irby addressed the communications at issue to Rancourt. The homicide occurred in 2005, and detectives investigated and compiled the evidence against Irby primarily then. Because of two, unrelated remands from appellate decisions in subsequent years, it was 11 years later, in 2016, that Irby claims an intercept of his communications occurred with a then newly appointed attorney. This distinguishes Cory. Where state actors had purposefully intercepted attorney-client communications as part of their investigation, it was impossible to "isolate" the tainted information from legitimate investigation. 62 Wn.2d at 377. Here, because the State developed its case against Irby and tried him twice years before any intercept occurred, the State's underlying investigation can be isolated from any new discoveries that could have come from Irby's 2016 communications with Rancourt. And contrary to Irby's argument that the first two remands created an incentive for the State to discover Irby's confidential plans for the third trial, nothing about those reversals due to errors in jury selection implied doubt about the evidence of Irby's guilt for the murder and robbery charges pending in 2016.

The trial court also was entitled to consider the content of the opened kites that Irby voluntarily filed with the court. These kites mostly concerned Irby's frustrations with Rancourt, Pedersen, and the trial court. Where he wrote about the merits of his case, Irby focused on Tiscornia's alleged health problem, alleged malfeasance in tampering with or contaminating evidence by Washington State

Patrol employee David Northrup, Rock's safe and its contents as a possible motive for his murder, a possible defense to Irby's burglary charge, blood spots found by the garage's main door, Rock's alleged fear of his daughter and her boyfriends, Frank's report, credibility, and alleged cross-contamination of evidence, and concerns that detectives may have destroyed "rifle evidence" Irby bought from Rock.

Irby outlines five theoretical ways in which he says the State might have benefitted from this information. He theorizes the State could have taken countermeasures against his plan to enlist the press in aid of his defense. He argues his communications disclosed case law describing successful challenges to DNA evidence. He argues that the State could have taken extra steps to ensure Tiscornia's presence at trial because Irby expressed interest in his possible absence due to retirement. He argues the State could have contacted witnesses he identified. And he argues his alert to the presence of a mixture of Rock's and an unknown contributor's DNA on a card at the crime scene could have caused prosecutors to refrain from admitting this ambiguous evidence.

But none of these are realistic possibilities of prejudice to the fairness of Irby's fourth trial. Irby never explains how press coverage might influence a jury's assessment of the evidence amassed in 2005. The prosecution already had general knowledge of how DNA evidence might be challenged and that Tiscornia had retired. It is not realistic that the State could have preempted Irby's access to witnesses on whom Irby was focused but the State was not when Irby had multiple lawyers and investigators with an 11-year head start before his knowledge of these

witnesses was allegedly intercepted. Irby's argument overlooks that Pedersen testified he did not offer the card from the crime scene with the ambiguous DNA sample even at the second trial, three years before Irby asserts his communications were intercepted. With a new trial, Irby's opportunity was preserved to offer the card in evidence if he believed it was exculpatory, and to attempt to impeach DNA analyst Frank.

Finally, the testimony of the law enforcement witnesses at Irby's fourth trial focused on the evidence developed in the original 2005 investigation. This is true of the four law enforcement witnesses the State called at the fourth trial but not at the evidentiary hearing. Mullen, Reicherdt, Esskew and Tiscornia emphasized investigation and evidence they gathered in 2005. The focus of these witnesses' testimony on the 2005 investigation establishes the efficacy of permitting the parties at trial to voir dire them before they testified, to assure they had not gained any information from Irby's 2016 communications with Rancourt. Irby argues this offer was intended as an offer to the State to buttress its hearing evidence. The offer responded to Irby's argument and was not restricted to any party. This opportunity, had it been invoked, would have permitted discovery of any theoretical informational channel Irby hypothesizes could exist, and would have permitted the trial court to exclude any witness who had learned illicit information. While case law recognizes a witness may be aided by learning the defense strategy, Granacki, 90 Wn. App. at 604, here the relevant witnesses' testimony was focused on the 2005 investigation, unrelated to Irby's 2016 communications with Rancourt.

The State did not rule out absolutely the possibility of an undisclosed, illicit channel from a jail guard to a detective or member of the prosecution team. But this possibility must be evaluated in light of the evidence the jail was generally merely carelessly handling the kites, the lead detectives and prosecutors were unaware of any new discoveries in 2016, they relied on the evidence they had gathered 11 years earlier and presented at earlier trials, to the extent of Irby's disclosure of what was allegedly breached nothing could have significantly aided the prosecution or undermined the defense, and no subsequent trial testimony suggests otherwise. Findings of fact 7, 8, and 9 are supported by substantial evidence, and the State met its burden to prove beyond a reasonable doubt that Irby was not prejudiced by the jail guards' interception of his communications except only insofar as their misconduct destroyed his relationship with his attorney.

What remains is whether the trial court acted within its discretion in concluding a new trial would adequately address this prejudice and disincentivize future violations. We review de novo whether the trial court's conclusions of law are supported by its findings of fact. State v. Manion, 173 Wn. App. 610, 633, 295 P.3d 270 (2013). Given that the only prejudice left unrebutted was the loss of Irby's attorney-client relationship, conclusions of law 1, 2, 4, and 5 are supported by the trial court's findings. We previously held the superior court's consideration of the totality of the circumstances should include evaluating both "the degree of prejudice" to Irby's right to a fair trial and "the degree of nefariousness" by the state actors. Irby III, 3 Wn. App. 2d at 264. This is an egregious case of misconduct. The laxity of the jail shown here is indefensible under our constitutional principles.

29

Dismissal was appropriately considered, see Wilson, 149 Wn.2d at 9, and was actually considered, see Myers, 533 P.3d at 464. So too, however, was a more tailored remedy. See Morrison, 449 U.S. at 364. Cory held the State would not be disincentivized from gathering information to which it had no right if it only had to re-try the case, still benefiting from the illicitly gathered information. 62 Wn.2d at 377. But in the absence of the State's benefiting from information it should not have, the State is disincentivized from undermining a defendant's right to counsel if the court requires the State to re-try the case with new counsel. In ordering a new trial, with a new lawyer, the trial court gave Irby a full opportunity to be represented by counsel with whom he could be confident of confidential communications. This remedy accorded Irby his Sixth Amendment rights and was not an abuse of discretion.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____        _____
Chung, J.                      Dwyer, J.